UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HEILIG-MEYERS COMPANY, et al., | ) | Case No. **00-34533** |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| HEILIG-MEYERS COMPANY, et al., | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. **02-06158** |
| | ) | |
| WACHOVIA BANK, N.A., et al. | ) | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Heilig-Meyers Company ("Heilig-Meyers"), Heilig-Meyers Furniture Company ("Furniture Company"), Heilig-Meyers Furniture West, Inc., HMY Star, Inc., HMY RoomStore, Inc., and MacSaver Financial Services, Inc. ("MacSaver") (collectively, the "Debtors"), hereby move this Court pursuant to Fed. R. Civ. P. 56, as made applicable by Fed. R. Bankr. P. 7056, for a partial summary judgment in respect of Counts I and II of the Amended Complaint. Specifically, the Debtors seek a partial summary judgment establishing the Debtors' rights, subject to a determination of insolvency, to avoid the Avoidable Cash Transfers[1] and the Avoidable Liens pursuant to 11 U.S.C. §§ 547, 550 and 551.

## PRELIMINARY STATEMENT

As this Court is well aware, this adversary proceeding has focused on a series of transfers of cash and liens by the Debtors to Defendants which the Debtors allege meet all of the elements

---

[1] The Debtors adopt the definitions set forth in their Amended Complaint except in those instances in this Motion where a term is expressly defined differently.

of preferential transfers under § 547(b) of the Bankruptcy Code.  The transfers, which consist of principal payments totaling $167,232,942, certain interest payments, and approximately $130 million in liens, were made, for the most part, pursuant to a restructuring of the Debtors' pre-petition credit facilities with Defendants, as documented by the May 25, 2000 Documents.

To their credit, Defendants do not dispute the fact or amount of any of the transfers of cash or liens at issue in this case.   Indeed, Defendants acknowledge that they received the full amount of the $167,232,942 of cash transfers that are the subject of Count I of the Amended Complaint, as well as the approximately $130 million of lien transfers that are the subject of Count II of the Amended Complaint.  Rather, with the exception of their solvency defense, Defendants base their opposition to the Debtors' claims on a series of denials and defenses which primarily contend that (1) the initial transfer by the Debtors of the Berrios Proceeds was made outside of the preference period, and (2) the Defendants had a security interest in Heilig-Meyers' bank accounts which predated the preference period.

Each of these contentions—together with the other obligatory denials and defenses asserted by Defendants—fails as a matter of law.  First, as we show below, Defendants' contentions are expressly refuted by the May 25, 2000 Documents and the other operative documents at issue in this case.  Moreover, both Defendants' primary escrow and security interest defenses, as well as their other defenses and denials, cannot survive under the scrutiny of controlling law and the undisputed facts.  Indeed, as we show below, Defendants' contentions amount to little more than an after-the-fact attempt to disavow their own documents, and cannot overcome the Debtors' right to avoid the preferential transfers at issue in this case.   For these reasons, as explained in the ensuing discussion, the Debtors are entitled to a partial summary judgment on Counts I and II of the Amended Complaint.

This Motion is supported by the Affidavit of Ronald L. Barden (the "Barden Affidavit"), the deposition transcript of Charlene Johnson as Rule 30(b)(6) Corporate Representative of Wachovia, taken on July 3, 2003 (the "Johnson Deposition"), the deposition transcript of Robert R. Derrick as Rule 30(b)(6) Corporate Representative of Prudential and Pruco, taken on July 15, 2003 (the "Derrick Deposition"), and the composite Exhibits to the Johnson Deposition and Derrick Deposition (the "Exhibit Book"). All of the above documents have been filed in conjunction with this Motion.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Debtors' Pre-Petition Financing Arrangements.

1.      On or about January 13, 1995, MacSaver issued to Prudential and Pruco $60 million of 11.99% Series A Guaranteed Senior Notes due 2002 (as amended, modified or supplemented from time to time, the "Prudential Notes"), pursuant to the Note Agreement dated as of January 13, 1995, among MacSaver, as issuer, Heilig-Meyers, as guarantor, and Prudential and Pruco, as purchasers (as amended, modified and supplemented from time to time, the "Prudential Note Agreement"). See Final Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Providing the Pre-Petition Secured Lenders Adequate Protection (the "Adequate Protection Order"), pp. 4-5 ( ¶ G).

2.      On July 18, 1995, MacSaver, as borrower, and Heilig-Meyers, as guarantor, entered into a Credit Agreement with Wachovia (then known as Wachovia Bank of Georgia, N.A.), as agent for the Bank Group, to provide up to $400 million of revolving loans and letter of credit facilities to MacSaver, Heilig-Meyers and certain other subsidiaries (as amended, modified and supplemented from time to time, the "Credit Agreement"). Id. at p. 4 (¶ F).

3.      In January and August 1996, Furniture Company entered into two "synthetic" lease arrangements (the "Wachovia Synthetic Leases"), as follows: (a) a $21 million Tax Ownership Operating Lease in respect of certain properties located in Mount Sterling, Kentucky and Athens, Texas pursuant to the terms of, among other documents:  (i) the Lease Agreement dated as of January 31, 1996, among State Street Bank and Trust Company, as owner-trustee and lessor, Arthur J. MacDonald, as Kentucky Trustee, and Furniture Company, as lessee, and (ii) the Participation and Credit Agreement dated as of January 31, 1996, among Furniture Company, State Street Bank and Trust Company, as owner-trustee, the noteholders and certificate holders identified therein, and Wachovia as agent, in each case as amended, modified and supplemented; and (b) a $40 million Tax Ownership Operating Lease, in respect of certain properties in Hesperia, California and Richmond, Virginia pursuant to the terms of, among other documents: (i) the Lease Agreement dated as of August 1, 1996, among State Street Bank and Trust Company, as owner-trustee and lessor, and Furniture Company as lessee, and (ii) the Participation and Credit Agreement dated as of August 1, 1996, among Furniture Store, State Street Bank and Trust Company, as owner-trustee, the noteholders and certificate holders identified therein, and Wachovia as agent, in each case as amended, modified and supplemented. Heilig-Meyers guaranteed Furniture Company's obligations under both of these transactions. Id. at pp. 5-6 (¶ I).

4.      On August 5, 1998, Furniture Company entered into a $46.6 million "synthetic" lease arrangement (the "FUNB Synthetic Lease") pursuant to, among other things, (1) a Lease Agreement dated as of August 5, 1998, between First Security Bank, National Association, as owner-trustee under the HM Realty Trust 1998-1, as lessor, and Furniture Company, as lessee (as amended, modified, and supplemented from time to time, the "FUNB Lease Agreement") and

(2) a Trust Agreement (as amended, modified, and supplemented from time to time), between

First Union National Bank, as holder, and First Security Bank, National Association, as owner-

trustee, pursuant to which HM Realty Trust 1998-1 issued a $15 million Holder Certificate,

which was guaranteed by Heilig-Meyers. Id. at p. 5 (¶ H).  Wachovia is the holder of the $15

million Holder Certificate.  See Exhibit 4 to the Exhibit Book, ¶ 33.

## Letter of Credit Applications[2]

5.      In or about March, 1999, Heilig-Meyers executed an application for the issuance

by Wachovia of a Standby Letter of Credit in favor of Lumbermens Mutual Casualty Company,

American Motorists Insurance Company, American Manufacturers Mutual, Insurance Company,

American Protection Insurance Company, and National Loss Control Service Corporation in the

scheduled maximum amount of $17,400,000, bearing Standby Letter of Credit No. LC968-

108943.  A copy of this Letter of Credit Application is included as part of the composite Exhibit

28 in the Exhibit Book.

6.      In or about March, 2000, Heilig-Meyers executed an application for the issuance

by Wachovia of a Standby Letter of Credit in favor of United States Fidelity and Guaranty

Company in the scheduled maximum amount of $10 million, bearing Standby Letter of Credit

No. LC968-12495.  A copy of this Letter of Credit Application is also included as part of

composite Exhibit 28 in the Exhibit Book.

7.      Both the March, 1999 and March, 2000 Letter of Credit Applications purport to

grant Wachovia a security interest in all of the property of Heilig-Meyers held by Wachovia as

security for the contingent obligations of Wachovia under the Standby Letters of Credit. Id.

---

[2] Defendants have not produced, and apparently have not been able to locate, the original Letter of Credit
Applications referred to below and, as a result, have not been able to confirm which, if any, signature pages are
associated with each specific application, or when any of the signature pages may have been executed.
Nevertheless, for purposes of this motion *only*, the Debtors assume that the Letter of Credit Applications were
executed by Heilig-Meyers in March, 1999 and March, 2000 as contended by Wachovia.

**The April, 1999 Restructuring of the Debtors' Pre-Petition Financing Arrangements**

8.      On April 15, 1999, Heilig-Meyers, MacSaver, the Bank Group, Prudential and Pruco and The Long Term Credit Bank of Japan, Limited entered into an Intercreditor and Sharing Agreement in connection with the contemplated sale by Heilig-Meyers of its Rhodes and Mattress Discounters Subsidiaries (the "April 1999 Intercreditor Agreement").  A copy of the April 1999 Intercreditor Agreement is attached as Exhibit A to the Barden Affidavit.

9.      In connection with April 1999 Intercreditor Agreement, the Debtors and the Bank Group entered into Amendment No. 7 to the Credit Agreement, and the Debtors and Prudential and Pruco entered into an Amendment to the Prudential Note Agreement dated April 15, 1999. See Barden Affidavit, ¶ 4.

**The May 25, 2000 Restructuring of the Debtors' Pre-Petition Financing Arrangements (the "May 25, 2000 Restructuring")**

10.      On March 21, 2000, the Debtors and the Bank Group executed a term sheet for the restructuring of the Pre-Petition Financing Documents, a copy of which is included as Exhibit 16 in the Exhibit Book.[3]  Among other things, the Term Sheet contemplated that the Bank Group would extend the maturity date under the Credit Agreement from July 2000 to July 2001 and would relax certain financial convents then existing under the Credit Agreement.  Id. In exchange for these accommodations, the Terms Sheet also contemplated that the Debtors, with the consent of Defendants, would effectuate the sale of the assets and business operations (the "Berrios Sale") of Heilig-Meyers' wholly owned subsidiaries HMPR, Inc. and MacManufacturing, Inc. (the "Berrios Subsidiaries") for a minimum of $100 million, would pay the Berrios Proceeds to Defendants, and would provide collateral for approximately $130 million of the Debtors' obligations under the Pre-Petition Financing Documents.  Id.

---

[3] According to Prudential and Pruco's Corporate Representative, Prudential and Pruco also executed the Term Sheet although no copy of the Term Sheet containing their signatures has been identified or produced in this case.

11.     On or about April 13, 2000, the Bank Group delivered to the Debtors consents to the Berrios Sale (the "Bank Consents").  A copy of the form Bank Consent is included as Exhibit 14 in the Exhibit Book.  By their terms, the Bank Consents conditioned the consent on the Berrios Sale yielding a minimum gross purchase price of $100 million and the deposit of the Berrios Proceeds "in escrow" to be held by Wachovia, as escrow agent, pending execution of a new Intercreditor and Sharing Agreement among the Bank Group, Prudential and Pruco, and Heilig-Meyers and MacSaver. Id.

12.     On April 19, 2000, the Debtors closed the Berrios Sale, and on April 20, 2000, the Debtors received on deposit in the MacSaver Financial Master Account maintained at Wachovia, Account No. 8735-029195, the sum of $8,200,000, which represented the stock sale component of the Berrios Sale, the sum of $73,587,000, which represented the primary portion of the asset sale component of the Berrios Sale, and the sum of $2,000,000 which represented the excess cash on hand of Berrios.  See Barden Affidavit, ¶ 5.  The stock sale portion of the Berrios Sale was paid to Heilig-Meyers as owner of 100% of the stock of the Berrios Subsidiaries, and the asset sale portion of the Berrios Sale and excess cash on hand was paid to Heilig-Meyers as partial repayment of the Berrios Subsidiaries' intercompany debt to Heilig-Meyers.  See Barden Affidavit, ¶ 5.

13.     Also on April 20, 2000, Prudential and Pruco entered into a Consent Agreement with Heilig-Meyers and MacSaver relating to the Berrios Sale (the "Prudential Consent").  A copy of the Prudential Consent is included as Exhibit 34 in the Exhibit Book.  By its terms, the Prudential Consent provided that the Berrios Proceeds "shall be held in escrow under that certain Escrow Agreement (the "Escrow Agreement"), dated as of even date herewith, by and among the Company, the Guarantor, the Note Purchaser, Wachovia Bank, N.A., FUNB and Wachovia

Bank, N.A., as escrow agent…" Id. Notwithstanding the reference to the "Escrow Agreement" in the Prudential Consent, no written Escrow Agreement was ever executed or agreed to by the parties.  Johnson Deposition, pp. 83-84; 176-177; Derrick Deposition, p. 82.

14.     On April 21, 2000, the Berrios Proceeds were transferred to a newly formed commercial demand deposit account maintained at Wachovia Bank, N.A. entitled "MacSaver Non-Operating Cash Escrow Account," Account No. 8737-008286.  See Barden Affidavit, ¶ 7.

15.     On May 11, 2000, the Debtors received on deposit in the MacSaver Financial Master Account the sum of $4,714,559.56, which represented an additional payment of the Berrios Proceeds in respect of the Berrios Subsidiaries' intercompany debt to Heilig-Meyers.  On May 12, 2000, these funds also were transferred to the MacSaver Non-Operating Cash Escrow Account.  See Barden Affidavit, ¶  8.

16.     On May 15, 2000, Paige Wilson, on behalf of MacSaver, executed a Financial Management Account Agreement (the "FMAA") at the request of Wachovia.  A copy of the FMAA is included as Exhibit 27 in the Exhibit Book.   By its express terms, the FMAA confirmed that MacSaver was the owner and account holder of the MacSaver Non-Operating Cash Escrow Account, and that "each investment decision made with respect to [the MacSaver Non-Operating Escrow Account] is, and will be, solely the responsibility of [MacSaver]."  Id. at ¶¶ 1(c), 5. The FMAA further confirmed that MacSaver established the Non-Operating Cash Escrow Account as a non-interest bearing account "subject to the terms of [the FMAA] and (except to the extent modified by the express terms of [the FMAA]) to the standard terms and conditions governing business checking accounts at Wachovia."  Id. at ¶ 2. Finally, the FMAA confirmed that the FMAA "and Wachovia's standard terms and conditions governing deposit

accounts at Wachovia constitute the entire understanding between Wachovia and [MacSaver] concerning the FMA and transactions related thereto." Id. at ¶ 11.

17.     The restructuring contemplated by the Term Sheet was initially anticipated to close on or about April 24th, 2000, to coincide with the Berrios Sale.  Johnson Deposition, pp. 138-140.   Because of the refusal of one of the members of the Bank Group, Credit Lyonnais, to approve the final documentation in its then existing form, the closing did not occur as initially scheduled.  Id. Between April 25th and May 25th, revisions to the restructuring documents were requested by various of the parties with the result that the final documentation as reflected by the May 25, 2000 Documents was not agreed upon until May 25, 2000.  Johnson Deposition, pp. 140-144; 149-151.

**The May 25, 2000 Documents**

18.     On May 25, 2000, the Debtors and Defendants (or their predecessors in interest) entered into a series of agreements, including the:

(a) Intercreditor and Sharing Agreement, a copy of which is included as Exhibit 3A in the Exhibit Book;

(b) Security Agreement, a copy of which is included as Exhibit 3B in the Exhibit Book;

(c) Pledge Agreement, a copy of which is included as Exhibit 3C in the Exhibit Book;

(d) Assignment of LOC Cash Collateral Account, a copy of which is included as Exhibit 3D in the Exhibit Book;

(e) Assignment of Wachovia Lease Financing Cash Collateral Account, a copy of which is included as Exhibit 3E in the Exhibit Book;

(f) Assignment of Non-Operating Cash Escrow Account, a copy of which is included as Exhibit 3F in the Exhibit Book;

(g) Amendment No. 9 to the Credit Agreement, a copy of which is included as Exhibit 3G in the Exhibit Book;

(h) Various mortgages, deeds of trust, and UCC-1 financing statements in UCC-1 financing statements in favor of Defendants; and

(i) Amendment No. 3 to the Prudential Note Agreement, a copy of which is attached as Exhibit C to the Barden Affidavit.

19.    The Security Agreement contained an express representation and warranty that each of the Debtors "is the legal and beneficial owner of, and has good and valid rights in and marketable title to, the Collateral," and the definition of Collateral in the Security Agreement included, "all financial assets on deposit in or credited to . . . the Non-Operating Cash Escrow Account, including without limitation, cash and cash equivalents."  Exhibit 3B in the Exhibit Book, ¶¶ 4(b) and 2(i); Memorandum Opinion dated March 25, 2003 on Defendants' Motion to Dismiss ("Memorandum Opinion"), p.5.

20.    The Assignment of Non-Operating Cash Escrow Account referred specifically to the MacSaver Non-Operating Cash Escrow Account that was already in existence at the time of the execution of the May 25, 2000 Documents, and provided for the grant by MacSaver of a security interest in the account.  Exhibit 3F in the Exhibit Book, ¶ 2.1; Memorandum Opinion, p. 6.

21.    The Intercreditor and Sharing Agreement confirmed that at least $88 million of the Berrios Proceeds had already been received by the Debtors (and held on deposit in the MacSaver Non-Operating Cash Escrow Account) prior to the execution of the May 25, 2000 Documents, and expressly obligated the Debtors "to [thereafter] deliver such additional Berrios

Proceeds to the Collateral Agent as and when received."  Exhibit 3A in the Exhibit Book, ¶ 4;

Memorandum Opinion, p. 6.

**Transfers Within the Preference Period**

22.     During the preference period, and specifically between May 23, 2000 and July 26,

2000, the Defendants received cash transfers from or on account of the Debtors in the aggregate

amount of $167,232,942.   See Barden Affidavit, ¶ 9; Exhibit 7 in Exhibit Book. Of these

amounts, $99,826,829.48 represented the Berrios Proceeds that the Debtors transferred to

Defendants. See Exhibit 6 in Exhibit Book; Johnson Deposition, pp. 30-31.  Defendants contend

that $88,887,232 of the Berrios Proceeds were transferred outside of the preference period, but

acknowledge that the remaining cash transfers were all physically transferred from the Debtors

to Defendants within the preference period.   See Johnson Deposition, pp. 38, 39-40, 50-57, 63,

80; Derrick Deposition, pp. 127-128.

23.     On or after May 25, 2000, and pursuant to the May 25, 2000 Documents, the

Debtors transferred to or for the benefit of Defendants liens and security interests in various

property owned by the Debtors.  See Adequate Protection Order, ¶ K.  The Debtors maintain that

the May 25, 2000 Documents limited the amount of the obligations or debts that were secured by

the Debtors' grants of liens and security interests to $130 million.   Defendants disagree and

contend that there is no cap on the amount of the liens and security interests that were granted by

the Debtors, and that the full amount of Defendants' outstanding obligations—totaling in excess

of $160 million—is secured by the liens and security interests.

24.    To this date, pursuant to the Adequate Protection Order and Supplemental Adequate Protection Order,[4] the Debtors have liquidated collateral that was subject of the May 25, 2000 liens and security interests for the total amount of $119,886,000. See Barden Affidavit, ¶ 11. Of this amount, $112,251,000 has already been transferred to Wachovia as post-petition collateral agent for Defendants, and the remaining $7,635,000 is awaiting disposition. Id. The value of the collateral that has yet been liquidated is estimated at $37, 650,000. Id.

## ARGUMENT

I.    **THE DEBTORS MADE PREFERENTIAL CASH TRANSFERS OF $167 MILLION**

A.    **THE DEBTORS TRANSFERRED THE BERRIOS PROCEEDS TO DEFENDANTS WITHIN THE PREFERENCE PERIOD**

During the 90 days prior to the petition date, Defendants received cash payments for or on behalf of the Debtors in the amount of $167,232,942, as reflected on the payment schedule included in the Exhibit Book as Exhibit 7 (the "Payment Schedule"). Of these payments, the only payment that Defendants contend was not physically transferred from the Debtors' account within the preference period was the payment of $88,887,232 of Berrios Proceeds on May 26, 2000. Defendants maintain that this payment, which was transferred from the MacSaver Non-Operating Cash Escrow Account, should not be considered as a transfer by the Debtors within the preference period because of Defendants' claims that:

(1) the Debtors did not have any interest whatsoever in the MacSaver Non-Operating Cash Escrow Account; instead the Account was held by Wachovia, as escrow agent for itself and the other Defendants, and at all times was under the exclusive dominion and control of Wachovia, as escrow agent;

---

[4] Final Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Providing the Pre-Petition Secured Lenders Supplemental Adequate Protection (hereinafter the "Supplemental Adequate Protection Order").

(2) during the period that the payment was credited to the MacSaver Non-Operating Cash Escrow Account—from April 21, 2000 through May 25, 2000—the payment was held "in escrow" by Wachovia, as escrow agent for itself and the other Defendants; and

(3) the transfer of the payment by the Debtors thus should be deemed to have occurred when the payment was transferred *into* the MacSaver Non-Operating Cash Escrow Account on or about April 21, 2000, rather than when the payment was transferred to Defendants on May 26, 2000.

Defendants also maintain that neither the May 26, 2000 transfer of Berrios Proceeds, nor the May 31 and June 26 transfers of Berrios Proceeds, should qualify as transfers of property of the Debtors because, according to Defendants, none of the Berrios Proceeds were property of the Debtors.  Instead, Defendants contend that all of the $99,826,829.48 of Berrios Proceeds that were transferred to Defendants were the property of non-debtor former subsidiaries of Heilig-Meyers.

As discussed below, neither Defendants' "escrow" argument nor "property of the Debtors" argument is sufficient even to create an issue of fact.  To the contrary, both of these arguments are negated by the express terms of the May 25, 2000 Documents and the FMAA, as well as by the controlling law on escrows and the indisputable facts regarding the Debtors' ownership of the Berrios Proceeds.

1.    **Pursuant to the Express Terms of the May 25, 2000 Documents and the FMAA, MacSaver was the Legal and Beneficial Owner of the MacSaver Non-Operating Cash Escrow Account, and the Account Was Not the Subject of Any Escrow Agreement**

As noted above, Defendants' contention that the Berrios Proceeds were transferred into escrow outside of the preference period hinges on their ability to establish that Wachovia, as escrow agent, was the owner of the MacSaver Non-Operating Cash Escrow Account and that

Wachovia and the other Defendants were the beneficiaries of the account.  However, Defendants cannot point to any signature card, account opening documents or other bank records which identify Wachovia, as escrow agent, as the owner or responsible party over the account.

To the contrary, the only written agreements, and the only official bank records that exist, establish unequivocally that:

(1) the MacSaver Non-Operating Cash Escrow Account was a standard business checking account with financial management account privileges;

(2) MacSaver at all times was the legal and beneficial owner of the account as well as all of the proceeds of the account;

(3) MacSaver was solely and exclusively responsible for any investment decisions with respect to the account, without any input, recommendation, or responsibility of Wachovia;

(4) the only agreements which governed the account and the understanding between MacSaver and Wachovia regarding the account were the FMAA and the standard terms and conditions governing deposit accounts at Wachovia; and

(5) until MacSaver assigned the account to Wachovia pursuant to the May 25, 2000 Assignment of Non-Operating Cash Escrow Agreement, the account held the $88 million of Berrios Proceeds transferred on May 26, 2000.

> As this Court has already observed:
>
> [T]he security agreement attached as exhibit B to the complaint contains an express representation and warranty that each of the debtors "is the legal and beneficial owner of, and has good and valid rights in and marketable title to, the Collateral held by it . . . Am. Compl., Ex. B, at 5.  The definition of collateral in the security agreement includes, "all financial assets on deposit or credited to . . . the Non-Operating Escrow Account, including without limitation, cash and cash equivalents." <u>Id.</u> . . .

> Moreover, the language of the assignment of escrow account (exhibit F to the amended complaint), reflects that the demand deposit account that became the escrow account was already in existence at the time of the execution of the May 25, 2000 documents and was owned by debtor MacSaver Financial Services, Inc.  Specifically, the assignment refers to the account number of MacSaver's demand deposit account and provides for the grant by MacSaver of a security interest in the account (Am. Compl., Ex. F, ¶ 2.1(a)).

> Finally, the Intercreditor and Sharing Agreement confirms that at least $88,000,000 of the Berrios Proceeds had already been received by the debtors (and held on deposit in the MacSaver demand deposit account) prior to the execution of the May 25, 2000 documents, and expressly obligated the debtors "to [thereafter] deliver such additional Berrios Proceeds to the Collateral Agent as and when received." (amended complaint, exhibit A, ¶ 4).

Memorandum Opinion, pp. 5-6.

Consistent with the May 25, 2000 Documents, the FMAA specifically provides that the MacSaver Non-Operating Cash Escrow Account was the checking account of MacSaver, and that "each investment decision made with respect to [the MacSaver Non-Operating Escrow Account] is, and will be, solely the responsibility of [MacSaver]."  See Exhibit 27 in the Exhibit Book, ¶¶ 1(c), 5.  The FMAA further confirms that MacSaver established the Non-Operating Cash Escrow Account as a non-interest bearing account "subject to the terms of [the FMAA] and (except to the extent modified by the express terms of [the FMAA]) the standard terms and conditions governing business checking accounts at Wachovia."  Id. at ¶ 2. Finally, the FMAA states that the FMAA "and Wachovia's standard terms and conditions governing deposit accounts at Wachovia constitute the entire understanding between Wachovia and [MacSaver] concerning the FMA and transactions related thereto."  Id. at ¶ 11.

Significantly, the FMAA is the **only** account record of Wachovia—other the May 25, 2000 Documents—which identifies the account holder of the MacSaver Non-Operating Cash

Escrow Account.  Despite the Debtors' specific requests in discovery, neither Wachovia, nor any of the other Defendants, has been able to identify a single bank record which contradicts the FMAA.

Moreover, when asked at deposition how Wachovia could reconcile the specific terms of the FMAA with Defendants' contention that neither Heilig-Meyers nor MacSaver had any interest in the account, the best that Wachovia's corporate representative could do was to dismiss the FMAA as a mistake "by an administrative assistant who was asked by a records group to get some kind of documentation and she made the wrong decision as to who to send the document to.  She was cleaning up an account that was open that did not have a piece of paper." Johnson Deposition, pp. 232-233.[5]

As the Debtors discuss in the next section of this memorandum, Wachovia's attempts to avoid the FMAA, like Defendants' efforts to ignore the May 25, 2000 Documents, are unavailing.  Accordingly, on the basis of the May 25, 2000 Documents and the FMAA alone, Defendants' "escrow" argument should be rejected, and the transfer of the Berrios Proceeds should be treated like the other transfers on the Payment Schedule as a transfer of property by the Debtors within the preference period.

> **2.**       **Defendants' Assertion of an Escrow With Respect to the MacSaver Non-Operating Cash Escrow Account is Barred by the Parol Evidence Rule**

It is not surprising considering the unequivocal nature of the May 25, 2000 Documents and the FMAA, and the absence of any written agreement or bank records contradicting these documents, that Defendants are forced to weave a patchwork tapestry of emails, random consents, and alleged oral understandings by the Debtors to present their picture of the purported

---

[5] By its express terms, the FMAA is governed by North Carolina law.  As explained in the next section of this memorandum, Wachovia's corporate representative's testimony of an alleged "mistake" by Wachovia in entering into the FMAA is barred by North Carolina's version of the parol evidence rule.

escrow agreement covering the Berrios Proceeds.  Defendants' tapestry is threadbare and, more importantly, cannot even be considered in view of the parol evidence doctrine as applied in Virginia, North Carolina and New York.[6]

As a threshold matter, the Debtors do not dispute the fact that the term "escrow" was used or referred to repeatedly both by Defendants and the Debtors in connection with the MacSaver Non-Operating Cash Escrow Account.  The Debtors also do not dispute that the Bank Group and Prudential and Pruco executed consents to the Berrios Sale which were subject to the condition that the proceeds from the sale would be held in escrow by Wachovia, as escrow agent, pending execution of a new Intercreditor and Sharing Agreement—although the written escrow agreement referred to in the Prudential Consent was never executed nor agreed to pay the parties.  Finally, the Debtors do not dispute either the fact that (1) the Debtors had agreed in principle via the Term Sheet to pay Defendants the Berrios Proceeds in the event the restructuring was consummated, or (2) during the pendency of the parties' negotiation of the May 25, 2000 Documents the Debtors agreed not to access the funds in the Non-Operating Escrow Account.

As we discuss in the next section of this brief, these "facts" do not even begin to approach the requirements of a legal escrow under the controlling law.  More importantly, under the parol evidence doctrine, they are rendered completely academic and cannot ever be considered to vary, alter, or contradict the terms of the May 25, 2000 Documents and the FMAA.

In applying the parol evidence doctrine under Virginia  law, the Fourth Circuit has explained:

> In the absence of ambiguity, a court may not consider extrinsic evidence as to the intent of the contracting parties. Where an agreement is complete on its face and is plain and unambiguous in

---

[6] By their terms, the May 25, 2000 Documents are governed either by the laws of Virginia, North Carolina, or New York.

> its terms, the court is not at liberty to search for its meaning beyond the instrument itself . . . .
>
> [T]his rule has nowhere been more strictly adhered to in its integrity than in Virginia.

Schneider v. Continental Casualty Co., 989 F.2d 728, 731 (4th Cir. 1993)(finding that the district court committed fundamental error by its admission of, and reliance on, parol evidence where the language of the contract was unambiguous)(citations omitted).  See also  International Organization of Masters v. Coal Terminal Towing Corp, ("when the parties set out the terms of their agreement in a clear and explicit writing, that document becomes the sole memorial of the contract and sole evidence allowed to resolve any dispute arising upon the contract between the parties.");  In re Preston, 47 B.R. 354, 356-357 (E.D. Va. 1983)("Oral agreements between the parties to a written contract made before or at the time of the execution of the contract are inadmissible to vary, alter, or contradict its terms or to affect its construction, because all such alleged oral agreements are considered merged in the written contract.  An unambiguous written contract cannot be varied by proof of a parol agreement different from that contained in the written contract.").

North Carolina's version of the parol evidence rule is equally compelling, and has been applied to bar parol evidence under facts strikingly similar to those at issue in this proceeding. For instance, in Thompson v. First Citizens Bank & Trust Co., 567 S.E.2d 184, 188-189 (N.C. Ct. App. 2002), a bank claimed, much like Wachovia has in this case with respect to the FMAA, that it had provided a customer with a form agreement "by mistake."  The Thompson court held that under North Carolina law the bank's assertion that the form was given to the customer based on a bank employee's mistake was barred by the parol evidence rule, and, thus, determined that summary judgment had been properly entered against the bank by the lower court. Id.  See also

<u>Vernon Carlton Sales, Inc. v. SSMC Inc., N.V.</u>, 1995 U.S. App. LEXIS 10145, *9 (4th Cir. 1995)("Under North Carolina law, the parol evidence rule prohibits the admission of parol evidence to vary, add to, modify, or contradict a written instrument intended to be the final integration of a transaction.  The district court properly concluded that the Letter Agreement was ' a document complete in itself' and 'not ambiguous by its own terms,' . . . and, therefore, that testimony concerning agreements or understanding dating prior to or contemporaneous with the execution of the Letter Agreement . . . was not admissible under the parol evidence rule.")(citations omitted).

Like Virginia's and North Carolina's application of the parol evidence rule, the Second Circuit has repeatedly explained the rule under New York law in comparable terms:

> It is a fundamental principle of contract interpretation, that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and that no parol evidence or extrinsic evidence is admissible.  Consequently, any conceptions or understandings any of the parties may have had during the duration of the contracts is immaterial and inadmissible.

<u>Int'l Klafter Company, Inc. v. Casualty Co., Inc.</u>, 869 F.2d 96, 99  (2d Cir. 1989) (citations omitted).  <u>See also</u>  <u>Nicholas Laboratories Limited v. Almay, Inc.</u>, 900 F.2d 19, 20-21 (2d Cir. 1990)( "Under New York law, we first look to the written agreement itself to discern the parties' intent and limit our inquiry to the words of the agreement itself so long as the agreement sets forth the parties' intent clearly and unambiguously.")(citations omitted).

Regardless of whether the Court applies the law of Virginia, North Carolina, or New York, the application of the parol evidence rule in this case cannot be avoided.  This is particularly true considering the absolute clarity, consistency, and absence of any ambiguities in both the May 25, 2000 Documents and the FMAA.

Perhaps the best way to demonstrate the appropriateness of this case for application of the parol evidence rule is to compare the actual language of the May 25, 2000 Documents with the "escrow" arrangement and understanding that Defendants claim was *really* the deal. Again, the cornerstone of Defendants' "escrow" argument is that Wachovia and Defendants were the sole owner and beneficiaries of the MacSaver Non-Operating Cash Escrow Account and that the Debtors had no interest in that account or the proceeds of that account whatsoever. Yet, the Security Agreement specifically required MacSaver to represent that it had full legal and beneficial title to the MacSaver Non-Operating Cash Escrow Account as well as all cash and cash equivalents in that account, and the Assignment of Non-Operating Cash Escrow Account specifically provided for MacSaver to assign the account.

When asked during her deposition how Wachovia could reconcile its contention regarding the ownership of and interests in the MacSaver Non-Operating Cash Escrow Account with the language of the documents, the explanation offered by Wachovia's corporate representative was fascinating and revealing, particularly in view of her testimony that Wachovia never transferred an interest in the account to MacSaver or Heilig-Meyers.

Q:    If on April 21st when the bank account itself was established MacSaver had no interest in the account how did it acquire an interest in the account sufficient to sign the assignment of non-operating cash escrow account on May 25, 2000?

A:    They did not have an interest in the account containing the Berrios proceeds. Per the establishment of the credit documents this account happened to use the same account number, but established from that point forward that anything that came in that account they were going to be allowed to use an accommodation to liquidity. So they would have had to have had some kind of title to it at that—at that point, but not prior to. It just happened to use the same account number because the account was already opened.

Q:      Well, you're not suggesting, ma'am, that the account that was the subject of the assignment of non-operating cash escrow account was different from the account that existed the day before the document was signed, are you?

A:      I'm saying the day this was signed it didn't have anything in it. There were no non-operating cash proceeds because these were Berrios Proceeds that were long since to be distributed.

Q:      Ma'am, I'm asking a question about the bank account itself. On May 23rd, okay?

A:      Uh-huh (yes).

Q:      Did MacSaver have an interest in account number 8737-008286?

A:      No.

Q:      Okay. Then how did it acquire an interest on May 25th sufficient to assign the assignment of non-operating cash escrow account?

A:      I don't have any other way to answer it than to say that this was to govern what would come into the account from that point forward.

Q:      Okay.

A:      To say that by virtue of the document that the credit agreement established that there would be an account that they had—that they had—I don't even want to use the word title. I don't even know what the right word is. But the credit agreement signed May 25th said they would have this account, this escrow agreement would govern that account from that point forward.

Johnson Deposition, pp. 214-215.

Putting aside the absurdity of the proposition that any bank, let alone a bank of the size and sophistication of Wachovia, would "just happen to use the same account number because the account was already open," Ms. Johnson's further explanation that the Debtors "did not have an interest in the account containing the Berrios Proceeds" because the Berrios Proceeds were "long since to be distributed" even more directly contradicts the language of the May 25, 2000 Documents.

Again, the Intercreditor and Sharing Agreement specifically provided that the Berrios Proceeds were held on deposit in the MacSaver Non-Operating Cash Escrow Account on the date the May 25, 2000 Documents were signed, and further provided that the Berrios Proceeds "*will* be so applied" to the Debtors' obligations to Defendants.   Exhibit 3A in Exhibit Book, ¶ 4. Moreover, in the Security Agreement, MacSaver was specifically required to represent that it was "the legal and beneficial owner of, and had good and valuable right in and marketable title to" "all financial assets on deposit in or credited to  . . . the Non-Operating Cash Escrow Account including without limitation cash and cash equivalents." Exhibit 3B in Exhibit Book, ¶ 4(b) and 2(i).  Despite her reluctance, even Ms. Johnson was forced to concede that the Berrios Proceeds were not actually distributed from the Non-Operating Cash Escrow Account until the restructuring documented by the May 25, 2000 Documents was completed:

> It [the Berrios Proceeds] was distributed because the documents were
> executed, and the deal was signed, and everyone fulfilled their obligation.

Johnson Deposition, p. 314.

The applicability of the parol evidence rule to this case is further demonstrated by how easy it would have been for the parties to have modified the language of the May 25, 2000 Documents to accurately reflect the so-called "real deal."  For example, if the Berrios Proceeds had been distributed to Defendants as Ms. Johnson initially claimed, then the Intercreditor and Sharing Agreement easily could have reflected this fact.  More importantly, if Wachovia and the other Defendants were the only parties that had an interest in the MacSaver Non-Operating Cash Escrow Account, and if the purpose of the account going forward was merely to provide a vehicle for prospective deposits, it would have been much easier simply to have left the account in Wachovia's name and have required Heilig-Meyers and MacSaver to make the future deposits into that account.  We will leave it to Defendants to explain to this Court why, if Wachovia and

Defendants already held all of the interests in the account, they insisted instead that MacSaver represent and warrant that it was the legal and beneficial owner of the account, and then had MacSaver turn around and assign that account to Wachovia.

In the same vein, if Defendants' prior consent to the Berrios Sale on which Defendants place so much emphasis to support their "escrow" argument was truly understood to be effective, then why did not the Intercreditor and Sharing Agreement simply reflect this fact?  Why instead did the parties deem it necessary to specifically provide in the Intercreditor and Sharing Agreement that Defendants "*hereby consent* to the sale of Berrios and the application of the net cash proceeds from such sale to the Secured Obligations as provided herein?"  <u>See</u> Exhibit A in the Exhibit Book, ¶ 4.  Similarly, if there was in fact a legal escrow arrangement already in place with respect to the Berrios Proceeds, and if the MacSaver Non-Operating Cash Escrow Account was already established as the escrow account, why did the Intercreditor Agreement specifically provide that MacSaver "shall" establish the MacSaver Non-Operating Cash Escrow Account as the escrow account?

As the case law of Virginia, North Carolina, and New York explains, the express purpose of the parol evidence doctrine is to avoid just this kind of after-the-fact attempt to rewrite agreements.  The simple fact is that the May 25, 2000 Documents and the FMAA leave no room for the escrow argument asserted by Defendants, and, for this reason as well, the May 26, 2000 transfer of Berrios Proceeds must be included with the other cash transfers made by the Debtors during the preference period.

### 3.     <u>Defendants' Assertion of an Escrow Fails As a Matter of Controlling Law</u>

Defendants assert that the Berrios Proceeds were placed in escrow when the funds were transferred to the MacSaver Non-Operating Cash Escrow Account on April 21, 2000 in an effort

to fall within the purview of the Eighth Circuit's holding in <u>Carlson v. Farmers Home Admin. (In re Newcomb)</u>, 744 F.2d 621 (8th Cir. 1984).  This case holds that where property is transferred into a valid escrow pre-petition the operative date for determining whether the transfer occurred within the preference period is the date that the property was transferred *into* the escrow rather than the date the property was transferred out of the escrow.

The Debtors do not quarrel with the holding of <u>Newcomb</u> and its progeny.  Indeed, the <u>Newcomb</u> rule has been expressly adopted both by this Court and the Fourth Circuit Court of Appeals.  <u>See</u> <u>In re Dameron</u>, 206 B.R. 394, 403 (Bankr. E.D.Va. 1997), *aff'd*,  155 F.3d 718 (4th Cir. 1998).  Instead, the Debtors maintain that Defendants cannot meet the requirements for a legally valid escrow.

Debtors have discussed in the preceding section of this memorandum that Defendants' assertion of the purported escrow fails in the first instance due to the parol evidence rule because the assertion is in direct contradiction with the terms of the May 25, 2000 Documents and the FMAA.   However, even if the Court were to consider all of Defendants' "facts" which they assert in support of their escrow argument, Defendants' claim of escrow still fails to meet the requirements of an escrow as set forth by this Court and by the Fourth Circuit.

As an initial matter, it is important to note that "merely labeling a specific delivery of property as an escrow . . . does not give such characteristic to the particular transaction." <u>American  Service Co. v. Henderson</u>,  120 F.2d 525, 530 (4th Cir. 1941).  <u>See</u> <u>also</u> <u>In re Matter of Kemp</u>, 52 F.3d 546, 551 (5th Cir. 1995)(the fact that the parties labeled a fund "as an escrow fund in various writings" did not change the nature of the transaction and the fact that no valid escrow agreement was created by the parties); <u>In re Health Care Products, Inc.</u>, 159 B.R. 332, 338 (M.D.

Fla. 1993)(mere reference to a segregated account as an "escrow account" did not create escrow where legal requirements of an escrow were not met).

Rather, there are a number of essential elements that must be met before a valid legal escrow may be found to exist.   Specifically, this Court has defined an escrow as:

> A legal document (such as a deed), money, stock or other property delivered by the grantor, promisor or obligor into the hands of a ***third person***, to be held by the latter until the happening of a contingency or performance of a condition, and then by him delivered to the grantee, promisee or obligee.

In re Dameron,  206 B.R. at 402 (emphasis added).  See also  28 Am. Jur. 2d Escrow, Section 1 (An escrow "is an instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or a third party, the depository, to be kept by him or her until the performance of the condition or the happening of certain event and then delivered over to the grantee, promisee, or obligee.").

Consistent with this definition, this Court explained that by virtue of an escrow the escrow agent assumes a fiduciary duty to ***both*** parties to the escrow, and thus cannot have an interest itself in the escrowed property.  Id.

> As fiduciary to the lenders under the escrow agreements, the debtors could not have acquired an interest in the . . . loan proceeds deposited to the MidAtlantic account [the escrow account].

Id.  See also 28 Am. Jr. 2d Escrow, Section 19 ("By definition, an escrow agent or depository is not a party to the transaction, but acts as a neutral third party.").

In its affirmance of this Court's decision in Dameron,  the Fourth Circuit adopted and reiterated this Court's discussion of the elements of a legal escrow.  Like this Court, the Fourth Circuit cited to the Restatement (Second) of Trusts and stated:

> Where the owner of property delivers in escrow the subject matter or instrument of transfer, manifesting an intention that upon the

> happening of a certain event the depositee should deliver the
> subject matter or the instrument to a third person. . . *and the owner*
> *does not reserve the power of revocation*, a trust is created at the
> time of the delivery in escrow.

<u>In re Dameron</u>, 155 F.3d at 722-723 (emphasis added).

Defendants' assertion of an escrow with respect to the Berrios Proceeds literally does not meet *any* of these required elements.   First, Wachovia cannot possibly qualify as an escrow agent with fiduciary duties to the Debtors because by definition it was not a disinterested *third party*.  To the contrary, not only was Wachovia a member of the Bank Group, it was the administrative agent of the Bank Group, and held one of the largest participation interests in the Bank Group's credit facility to the Debtors.  Moreover, as Wachovia's corporate representative repeatedly stated during her deposition, not only did Wachovia claim an interest in the Berrios Proceeds during the period they were "in escrow," Wachovia maintained that its interests in the Berrios Proceeds, like the other Defendants, were far greater than the Debtors' interests, and that the Debtors, in fact, did not have any interest in the proceeds. <u>See</u> Johnson Deposition, p. 211. Again, as the Fourth Circuit observed in <u>Dameron</u> "under Virginia law, a trust fiduciary is prohibited from acquiring an equitable interest in trust property adverse to his principal." <u>In re Dameron</u>, 155 F.3d at 722.

Second, Defendants cannot meet the equally fundamental requirement that the property subject of the purported escrow was ever delivered to the alleged escrow agent.   As Wachovia's corporate representative acknowledged, the Berrios Proceeds did not consist of a bag of money that was handed to Wachovia for safe-keeping.  <u>See</u> Johnson Deposition, pp. 211-212.  Rather, like any bank account, the Non-Operating Cash Escrow Account created a debtor-creditor relationship between Wachovia as the debtor and the account holder as the creditor, and the Berrios Proceeds consisted of book-keeping entries to that account.  <u>Id.</u>

It is precisely because of this fact that Defendants go to such lengths to claim that the Debtors did not have any interest in the MacSaver Non-Operating Cash Escrow Account and it is precisely because of this fact that the absence of any bank records establishing Wachovia as the owner or responsible party of the account is so glaring.   In fact, as discussed in the preceding section, the only bank records or agreements that exist in this case establish unequivocally that MacSaver was the owner of all legal and beneficial interests in the MacSaver Non-Operating Cash Escrow Account and thus the Berrios Proceeds could only have been "delivered" to MacSaver.

Finally, even assuming that Defendants could somehow overcome the fact that Wachovia could not have been a valid escrow agent, and even if we overlook the fact that MacSaver was the owner of the MacSaver Non-Operating Cash Escrow Account, not Wachovia, Defendants' claim of an escrow still must fail as a matter of law.  As the Fourth Circuit stated in <u>Dameron</u>, in order to constitute a valid escrow the deposit of the property into escrow must be irrevocable. <u>Dameron</u>, 155 F.3d at 723.  Moreover, as the Restatement (Second) of Trusts cited to by the Fourth Circuit further explains, the condition of the escrow cannot be left to the depositor's discretion:

> It is not a deposit in escrow . . . and no trust arises at the time of deposit, if the depositor reserves a power of revocation or if the specified event is merely the depositor's future mental desire or intention

Restatement (Second) of Trusts, Section 32(d).  <u>See also</u> 28 Am. Jur.2d Escrow, Section 15 ("An instrument is not delivered in escrow and does not constitute an escrow, when its possession by the depository is subject to the control of the depositor.  Upon the deposit with the depositary, it must remain only for the grantee, obligee, or another person to perform the required condition, or for the event to happen, to have the instrument take effect.").

During her deposition, Wachovia's corporate representative testified that the condition of the alleged oral escrow agreement for the release of the Berrios Proceeds was the consummation of the restructuring of the Debtors' credit facilities.  See Johnson Deposition, pp. 99, 101.  Ms. Johnson also testified that during the period that the proceeds were held in the MacSaver Non-Operating Cash Escrow Account there were continued modifications to the restructuring documents and the documents were not finally approved until shortly before their execution on or about May 25, 2000.  Johnson Deposition, pp. 145-152.  Ms. Johnson further admitted that at any point during the negotiation of the restructuring documents any of the parties, including *the Debtors*, could have refused to go forward with the deal at their sole discretion.  Id. at pp. 146-147.   This testimony establishes the Debtors' discretionary control over the essential condition of the alleged escrow and thus in and of itself precludes Defendants from meeting the irrevocability requirement under the controlling law.

Significantly, Wachovia's corporate representative also acknowledged that there was never an agreement—indeed she could not even remember any discussions—with the Debtors regarding what would happen to the Berrios Proceeds if Defendants or the Debtors exercised their rights not to go forward with the deal.  Id. at pp. 155-156, 157-158.  The most she could say was that if the Debtors did not go forward with the deal, and if a sufficient time had passed (which she identified as May 30, 2000), the Debtors would have been in default under the Credit Agreement then in existence.  Id. Even here, however, Wachovia's corporate representative could not say whether the Bank Group would have been entitled to set off against the Berrios Proceeds or what their rights to the proceeds might have been and, instead, stated that she would have had to consult with her legal counsel.  Id. at p. 159.   In any event, however, Wachovia's

representative was adamant that under no circumstances would the Berrios Proceeds ever be returned to the Debtors.  Id. at 160.

Prudential and Pruco's corporate representative took an even more extreme position. Like Wachovia's corporate representative, he could not remember any of the specific discussions with the Debtors that comprised the alleged oral escrow agreement (Derrick Deposition, pp. 85-86), and like Wachovia's corporate representative he acknowledged that there were no discussions over what would happen if Defendants or the Debtors elected not to proceed with the restructuring.   See Derrick Deposition, pp. 86-87.   However, unlike Wachovia's corporate representative, Prudential and Pruco's corporate representative had absolutely no uncertainty or doubt over what Prudential and Pruco's right to the money would have been had the restructuring not occurred.  Instead, he repeatedly stated that once the Berrios Proceeds were deposited into the "escrow," the funds were Defendants' money plain and simple, no questions asked.  See Derrick Deposition, pp. 88, 90, 97, 128, 133.

This testimony further contradicts the existence of a valid escrow.   As the Fourth Circuit additionally explained in Dameron:

> An escrow arrangement, like all express trusts, is a contractual relationship, in which disbursement by the trustee is conditioned upon the happening of a specified occurrence.  ***It is, therefore, elementary that when trust conditions are not satisfied the trustee has a duty to return the property to the trustor***.[7]

Dameron, 155 F.3d at 723 (citations omitted)(emphasis added).

Aside from the fact that the "terms" of the alleged escrow agreement expressed by Wachovia's and Prudential and Pruco's corporate representatives in and of themselves negate any suggestion of a valid escrow, the testimony of Prudential and Pruco's corporate

---

[7] Ironically, the suggestion by Wachovia's corporate representative that Wachovia could have taken action against the Berrios Proceeds adverse to the interests of the Debtors would in and of itself preclude any possibility of an escrow because it would negate the required disinterested fiduciary role of the escrow agent.

representative further demonstrates why the application of the parol evidence rule is so necessary in this case.   When asked what he based his claim of immediate ownership of the Berrios Proceeds on, Prudential and Pruco's corporate representative responded by repeatedly pointing to the Prudential Consent.  See Derrick Deposition, pp. 74, 88.   Then when he was asked how he could reconcile this claim with the contradictory language of the May 25, 2000 Documents, he responded simply by stating that the earlier Prudential Consent "superceded" the May 25, 2000 Documents.  See Derrick Deposition, p. 174.

The foregoing discussion demonstrates the reason why the mere use of the term "escrow" is not sufficient to establish a legal escrow in this Circuit.  In fact, other than the use of the word escrow in various emails between and references by the parties, Defendants cannot point this Court to *anything* that supports their assertion that a valid escrow arrangement was ever effectuated with regard to Berrios Proceeds, let alone, that the proceeds were transferred into escrow outside of the preference period.

The only conclusion that can be drawn in this case is that there was no escrow and that the Debtors transferred the Berrios Proceeds on or after May 25, 2000 pursuant to the May 25, Documents.

**4.      The Indisputable Facts and Controlling Law Establish that the Debtors Were the Owners of the Berrios Proceeds at the time of their Transfer**

Aside from their contention that the first $88 million of the Berrios Proceeds should not be considered a preferential transfer because the funds were transferred into escrow outside of the preference period, Defendants also maintain that none of the Berrios Proceeds were property of the Debtors.  Instead, Defendants argue that the Berrios Proceeds represented proceeds from

the sale of the assets and operations of certain Heilig-Meyers' non-debtor subsidiaries, and thus presumably were the property of those entities.

Defendants' assertion is both factually unfounded and legally incorrect. At the time of the closing of the Berrios Sale and the receipt of the Berrios Proceeds by the Debtors in the MacSaver Financial Master Account, Heilig-Meyers held a $25 million equity interest in its Berrios Subsidiaries and $122,464,609 of intercompany debt owing from the Berrios Subsidiaries. See Barden Affidavit, ¶ 6. Pursuant to the terms of the Berrios Sale and the contemporaneous accountings of Heilig-Meyers and its Berrios Subsidiaries, $8,200,000 of the Berrios Proceeds were paid to Heilig-Meyers in direct purchase of Heilig-Meyers' stock in the subsidiaries, and the remaining Berrios Proceeds were paid to Heilig-Meyers in partial payment of the subsidiaries' intercompany debts to Heilig-Meyers. See Barden Affidavit, ¶ 6 and Memorandum attached thereto as Exhibit B. In short, from the moment that the Berrios Proceeds were received on deposit in the MacSaver Financial Master Account every dime of the Berrios Proceeds was the exclusive property of the Debtors.

Even assuming, however, that the non-debtor subsidiaries somehow did retain some interest in the Berrios Proceeds, the indisputable fact that the proceeds were received on deposit in the Debtors' account, that the proceeds were subject to the Debtors' right to withdraw, transfer, or otherwise use the funds, and, most importantly, that the proceeds were available, and in fact used to pay the *Debtors*' creditors establishes as a matter of law that the Berrios Proceeds were property of the Debtors for purposes of a preferential transfer claim.

In In re Cybermech, Inc., 13 F.3d 818, 820-821 (4th Cir. 1994), the Fourth Circuit affirmed the determination by the bankruptcy court that a transfer of funds was an avoidable preference, and rejected the preference defendant's argument on appeal that the funds at issue

had never been "property of the estate."  In explaining its holding that the funds were, in fact, property of the estate,  the Fourth Circuit stated:

> Once [the debtor] deposited [the] check into its account, commingling the money with its other funds, [the debtor] had a right to withdraw, transfer, or otherwise use the . . . funds in any way it wanted. [The debtor's] ability to exercise complete dominion and control over the funds is sufficient to demonstrate an interest in the property under the preferential transfer provision. Therefore, the [payment] transferred on August 24, 1987, was a transfer of an interest of the debtor in property.

Id.  (citations omitted).

Countless other decisions mirror the holding of Cybermech, and focus on the control exercised by a debtor over the disposition of funds to determine that funds constitute "property of the estate" for purposes of a preferential transfer action.   See e.g.   In re Kemp Pacific Fisheries, Inc., 16 F.3d 313, 316 (9th Cir. 1994)(affirming summary judgment entered avoiding transfer of funds and explaining "when the debtor uses the funds of a third party to pay an obligation of the debtor the Court must look to the source of the control over the disposition of the funds in order to determine whether a preference exists.  If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid independent of a third party whose funds are being used in. . . payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer.")(citations omitted); In re Matter of Southmark Corp., 49 F.3d 1111, 1116-1117 (5th Cir. 1995)(explaining that where check paid to preference defendant was drawn on debtor's general bank account which contained commingled funds and from which the debtor had unfettered discretion to pay its creditors, the funds transferred were "property of the debtor's estate."); In re Bullion Reserve of North America, 836 F.2d 1214, 1217 (9th Cir. 1988)(affirming summary judgment entered avoiding transfer of

funds as a preference where the funds at issue came from commingled bank accounts under the debtor's control and were used to pay off the debtor's creditors).

What is particularly ironic about Defendants' contention that the Berrios Proceeds were not the property of the Debtors is that Defendants were more than willing to accept the money, and indeed required that the Debtors' represent and warrant that they held full legal, equitable, and marketable title to the money.   In fact, if, as Defendants now suggest, the Berrios Proceeds were the property of the non-debtor subsidiaries which did not owe Defendants anything, what possible basis could Defendants have to justify their receipt and retention of the Berrios Proceeds?

The Debtors submit that the answer to this question is self-evident and for this reason as well requires that Defendants' argument that the Berrios Proceeds were not property of the Debtors' must be rejected out of hand.

**B.      DEFENDANTS' CONTENTION THAT THEY HELD A SECURITY INTEREST IN HEILIG-MEYERS' BANK ACCOUNTS PRIOR TO THE MAY 25, 2000 DOCUMENTS IS WITHOUT MERIT**

Apparently as an alternative to its "escrow" contention, the Bank Group has attempted to assert that prior to the May 25, 2000 restructuring and the execution of the May 25, 2000 Documents, the Bank Group held a blanket security interest in all of the property of the Debtors, including presumably the Berrios Proceeds.[8]   Remarkably, the Bank Group does not base this contention on any understanding that it had before, or at the time, of the execution of the May 25, 2000 Documents.   Rather, the Bank Group's security interest theory is based on a revelation

---

[8] Pruential and Pruco apparently also claim a similar security interest.  However, despite repeated questioning, Prudential and Pruco's corporate representative refused to explain the factual basis for this claim, and instead stated that the security interest question presented legal issues too complicated for him to understand.  See Derrick Deposition, pp. 138, 140, 145-47, 152-153.

that dawned on Wachovia within the last two months when Wachovia was compiling documents in response to discovery requests by the Debtors.  Johnson Deposition, pp. 60-61.

According to Wachovia's corporate representative, in reviewing the documents for production Wachovia "discovered" copies of Letter of Credit Application forms that Heilig-Meyers apparently signed in March of 1999 and March of 2000, respectively, in connection with two standby letters of credit.  Id. Wachovia also apparently "discovered" in the standard terms and conditions of the applications language which Wachovia now maintains gave the Bank Group a blanket security interest in all of the Debtors' property to secure all of the Debtors' obligations.[9]  Id.

Notwithstanding that neither Wachovia nor any other member of the Bank Group had the slightest clue at the time of this purported security interest,[10] and assuming for the sake of discussion that the Letter of Credit Applications were properly executed by Heilig-Meyers, Wachovia's contention that these forms could possibly have provided the Bank Group with a security interest is simply unfounded.

1.    **The Letter of Credit Applications Did Not Give Wachovia or the Bank Group a Security Interest in Anything**

According to Wachovia's corporate representative, Wachovia and the Bank Group acquired their security interest in Heilig-Meyers' property under the Letter of Credit Applications pursuant to paragraph 3(a) which provides, in pertinent part,

> [Heilig-Meyers agrees] [t]o pledge, and do hereby pledge to you as security for any and all obligations hereunder any and all of our

---

[9] During her deposition, Wachovia's corporate representative suggested that oral conversations with Heilig-Meyers regarding the purported "escrow" also might have somehow given rise to a security interest, but she conceded that there were no discussions about a security interest during any of these conversations and that her understanding that there might be a security interest did not arise by virtue of any of these conversations.  Johnson Deposition, pp. 246, 280.

[10] Wachovia's corporate representative testified that Wachovia never considered the security interest in any of its internal write-ups of the credit facility and never told any other member of the Bank Group or Prudential or Pruco about the purported security interest.  See Johnson Deposition, pp. 115-117, 153, 155, 290-291.

> property or the property of any one or more of us, now or any time
> hereafter in your possession or control . . . ,or that of any third
> person acting on your behalf, whether for the express purpose of
> being used by you as collateral or for safekeeping or for any other
> different purpose, a lien being hereby given you upon any and all
> such property for the aggregate amount of such obligations. . . . We
> hereby authorize you, acting in your discretion at any time and
> whether or not any property then held by you as collateral security
> hereunder is deemed by you to be adequate, to hold as additional
> collateral security any and all monies now or hereafter with you on
> deposit or otherwise to the credit of or belonging to us or anyone or
> more of us . . . .

Composite Exhibit 28 in Exhibit Book; Johnson Deposition, pp. 280-283.  Yet, when asked

specifically what property of Heilig-Meyers Wachovia (or a third party acting on Wachovia's

behalf) had in Wachovia's possession or control prior to May 25, 2000, Wachovia's corporate

representative only identified the Berrios Proceeds and the bank accounts Heilig-Meyers

maintained at Wachovia.  See Johnson Deposition, pp. 281-282.

Even assuming for the sake of discussion that the language of paragraph 3(a) in fact

covered bank accounts of Heilig-Meyers maintained at Wachovia, the controlling law of North

Carolina[11] bars any suggestion that the Letter of Credit Applications could have succeeded or

operated to grant Wachovia or the Bank Group a security interest in any of these accounts.   The

decision of the United States Bankruptcy Court for the Eastern District of North Carolina in In re

Laues, 99 B.R. 158, 161-162 (Bankr. E.D. N.C. 1988) is directly on point.

The matter came before the court on a motion by the Chapter 7 debtors to turn over funds

which had been directly deposited into the debtors' credit union checking account. Id. at 159.

The defendant credit union objected to the debtors' motion and claimed that it was entitled to

retain the funds as a result of language in the debtors' loan agreement. Id. Like Wachovia and the

Bank Group, the credit union contended that "it had a valid security interest in the debtors'

---

[11] The Letter of Credit Applications state on their face (see paragraph 8) that they are governed by the law of
Wachovia's principal of business which at the time was North Carolina.

account by virtue of broad language in the loan documents by which the debtors pledged to the credit union all deposits in their account with the credit union as security for the . . . loan." Id. at 161.

The Laues court rejected the credit union's argument, and held that under North Carolina law the credit union could not possibly have acquired a valid security interest in the debtors' bank account notwithstanding the broad language of the loan documents. Id. The court first observed that Article 9 of the Uniform Commercial Code as adopted in North Carolina specifically excluded bank accounts from the purview of the statute.[12] Id. The court then reviewed the common law of North Carolina, and determined that here as well, the language in the loan documents could not have established a valid security interest in the bank account.

> The relationship between the Credit Union and the debtor regarding the checking account is that of debtor/creditor, and it is difficult to comprehend how a loan from the Credit Union can be secured by a debt which the Credit Union owes. Pledges are recognized under the North Carolina common law, but a pledge "is a deposit of personal effects, not to be taken back, but on payment of a certain sum, by express stipulation, to be a lien upon it." The Credit Union does not hold the deposit as bailee of the debtor, but as the debtor's account debtor.

Id. at 161-162 (citations omitted).

The holding of Laues is clear and direct and on its face precludes as a matter of law the Bank Group's contention that it had a security interest in any of Heilig-Meyers' accounts prior to May 25, 2000.

---

[12] The exclusion of bank accounts from Article 9 of the Uniform Commercial Code continued until the revision of the Code in July of 2001. Accordingly, the exclusion of bank accounts from the Code was still in effect as of the date the Letter of Credit Applications were signed and, indeed, as of the dates the May 25, 2000 Documents were signed and the Debtors filed their petitions in this case.

**2.      The Bank Group Could Not Possibly Have Acquired a Security Interest in the Berrios Proceeds Prior to May 25, 2000**

Even if we disregard the controlling law of North Carolina, and assume that the Letter of Credit Applications somehow created a security interest in Heilig-Meyers bank accounts at Wachovia, the specific language of the Letter of Credit Applications, together with the undisputed facts in this case, remove the Berrios Proceeds from any possible reach of the security interest.

As discussed previously, the Letter of Credit Applications by their express terms limited the grant of the security interest to the property and bank accounts owned by the ***signators*** of the applications. <u>See</u> Composite Exhibit 28 in Exhibit Book.  The only signator of either application was Heilig-Meyers. <u>Id.</u>  Yet, according to Wachovia's corporate representative, Heilig-Meyers had absolutely no interest whatsoever in the MacSaver Non-Operating Cash Escrow Account, which again was the account that held the Berrios Proceeds from April 21, 2000 until the proceeds were transferred to Defendants pursuant to the May 25, 2000 Documents.[13] <u>See</u> Johnson Deposition, p. 211.

At bottom, the Bank Group's security interest argument would require a determination that the mere fact that the Berrios Proceeds were received as a bookkeeping entry for one day in a Heilig-Meyers account was enough to permanently imprint a perpetual security interest in the Berrios Proceeds, even after they were transferred out of any Heilig-Meyers account.  The Debtors are confident that even the Bank Group is not willing to go this far, and will concede that a creditor cannot hold a security interest in funds on deposit in a bank account, unless it also holds a security interest in the account itself.    For this reason as well, Wachovia and the Bank

---

[13] On this point, the Debtors are in absolute agreement with Wachovia and the Bank Group.  Indeed, pursuant to the May 25, 2000 Documents and the FMAA, the MacSaver Non-Operating Cash Escrow Account was under the sole legal and beneficial ownership of MacSaver—not Heilig-Meyers.

Group's contention that they held a security interest in the Berrios Proceeds prior to May 25, 2000 must fail as a matter of law.

     **3.**      **The Bank Group's Security Interest Argument is Also Irrelevant Because Only Obligations Under the Letters of Credit Could Possibly Have Been Secured**

Putting aside the fact that controlling North Carolina law clearly bars the Bank Group's assertion of a security interest in a bank account, and the undisputed fact that the Berrios Proceeds were not transferred to Defendants from a bank account that was possibly subject of the Bank Group's purported security interest, the Bank Group's security interest argument is still irrelevant.    By its express terms, paragraph 3(a) of the Letter of Credit Applications specifically refers to "any obligations *hereunder*" as the *only* obligations secured by the alleged security interest created by virtue of paragraph 3(a). See Composite Exhibit 28 of Exhibit Book. Yet, as Wachovia's corporate representative was forced to admit, none of the Berrios Proceeds were applied to the Letter of Credit obligations.  Instead, *all* of the Berrios Proceeds received by the Bank Group were applied against outstanding loans under the Debtors' revolving credit facility. Johnson Deposition, pp. 64-66.  This could hardly be otherwise since at the time of the transfer of the Berrios Proceeds to the Bank Group the Letters of Credit remained entirely unfunded. Johnson Deposition, p. 66.

In short, the facts set forth above render the Bank Group's security interest argument entirely immaterial.  Even were we to suspend reality and assume that a valid security interest was created by virtue of the Letter of Credit Applications, the only debts secured would have been Letter of Credit obligations, and it is undisputed that none of the relevant transfers were used to pay down these obligations.

C.    **THE DEBTORS' CASH TRANSFERS WERE MADE ON ACCOUNT OF ANTECEDENT DEBTS**

In their Amended Answer to the Amended Complaint the Bank Group admitted that any cash transfers at issue in this adversary proceeding were made on account of antecedent debts owed by the Debtors.    However, in their response to essentially the same question raised in the Debtors' First Request for Admissions, the Bank Group denied that the cash transfers were made on account of antecedent debts owed by the Debtors.    During her 30(b)(6) deposition, Wachovia's corporate representative clarified the Bank Group's position on this issue and confirmed that all of the cash transfers reflected on the Payment Schedule were indeed made on account of antecedent debts owed by the Debtors.    Johnson Deposition, pp. 75-77.

Similar to Wachovia, Prudential and Pruco also denied that any of the cash transfers to them were made on account of antecedent debts.    Yet, when he was asked during his deposition what the monies were applied to, Prudential and Pruco's corporate representative conceded that the cash transfers received by Prudential and Pruco were applied to the Debtors' existing obligations under the outstanding Prudential Notes.    See Derrick Deposition, p. 138.

By definition, this fact, which is confirmed by the express terms of the May 25, 2000 Documents, establishes as a matter of law that the Debtors' cash transfers to Prudential and Pruco were made on account of antecedent debts.

II.    **THE DEBTORS MADE PREFERENTIAL TRANSFERS OF LIENS TO DEFENDANTS IN THE AMOUNT OF APPROXIMATELY $130 MILLION**

A.    **ALL OF THE LIENS WERE TRANSFERRED WITHIN THE PREFERENCE PERIOD**

In this Court's Adequate Protection Order, the Court identified the various categories of liens, security interests, and mortgages and deeds of trust that the Debtors transferred to Defendants pursuant to the May 25, 2000 Documents.    Adequate Protection Order, p. 7

(Paragraph K).  As Ronald Barden attests to in his affidavit, most of the property that was subject of these liens has been liquidated, and has generated cash proceeds in the aggregate amount of $119,886,000(the "Collateral Proceeds").   Pursuant to the terms of the Adequate Protection Order and the Supplemental Adequate Protection Order, the Debtors have already transferred to Wachovia, as collateral agent for Defendants, the full amount of the Collateral Proceeds save for $7,635,000 which awaits disposition.   According to Mr. Barden, the estimated value of the remaining unliquidated collateral is $37,650,000, which means that the Debtors transferred to Defendants lien rights pursuant to the May 25, 2000 Documents with the total value of approximately $157,536,000.[14]

In both the Bank Group's Amended Answer to the Amended Complaint and Prudential and Pruco's Amended Answer to the Amended Complaint, Defendants admitted that any of the liens granted by the Debtors pursuant to the May 25, 2000 Documents were granted within 90 days of the petition date.   However, both the Bank Group and Prudential and Pruco denied Debtors' parallel request for admission no. 11 that "prior to May 25, 2000 the Debtors had not assigned, transferred, or otherwise granted to you any of the mortgages, deeds of trusts, liens or other security interests which were the subject of the May 25, 2000 Documents."

During her deposition, Wachovia's corporate representative explained the basis for the Bank Group's denial of request no. 11 on what she claimed was the security interest purportedly granted by Heilig-Meyers pursuant to the Letter of Credit Application forms. See Johnson Deposition, p. 239.   Prudential and Pruco's corporate representative presented an even simpler explanation.  Again, he stated that the question presented a legal issue which was better to left to

---

[14] This figure assumes, of course, that the Defendants are correct in their contention that there is no cap on the amount of liens and security interests that were granted by the Debtors pursuant to the May 25, 2000 Documents. As discussed earlier in this memorandum, the Debtors maintain that pursuant to the terms of the May 25, 2000 Documents the amount of the obligations or debts that were secured by the Debtors' grants of liens and security interests was capped at $130 million.

be answered by his lawyers, and disclaimed knowledge of any facts to support the denial of

request no. 11.

> Q:    Let me ask you, sir, what facts do you have to support the denial of request
> number 11?
>
> Mr. Meyer: Objection.
>
> A:    I cannot say whether our counsel has facts to support that denial or not.
>
> Q:    Okay.  My question to you though, sir, is what facts did you have as the corporate
> representative of Prudential to support the denial of request number 11.
>
> A:    Other than the fact that it is a legal question of which I am uncomfortable
> answering, I personally do not have any facts to support the denial.

Derrick Deposition, pp. 155-156.

The Debtors have already addressed Wachovia's Letter of Credit Application/security

interest  contention in their discussion in Section IB above.  With regard to Prudential and

Pruco's position on this issue, the Debtors believe that the testimony of their corporate

representative speaks for itself.

### B.    THE DEBTORS' LIEN TRANSFERS WERE MADE ON ACCOUNT OF ANTECEDENT DEBTS

In their Amended Answer to the Amended Complaint and response to the Debtors'

Request for Admission, Prudential and Pruco denied that any of the liens granted by the Debtors

pursuant to the May 25, 2000 Documents were granted on account of antecedent debts owed by

the Debtors to Defendants.  The Bank Group, by contrast, has admitted that some, but not all, of

the liens granted by the Debtors were granted on account of antecedent debts.

When asked during his deposition to provide the factual basis for Prudential and Pruco's

denial that the liens were transferred on account of antecedent debts, Prudential and Pruco's Rule

30(b)(6) corporate representative gave precisely the same answer that he did in regard to

Prudential and Pruco's denial that the cash transfers were made on account of antecedent debt. He testified that it involved a legal issue that he was not familiar with and that he therefore could not offer any facts to support the denial.  See Derrick Deposition, pp. 134-137. Remarkably, Prudential and Pruco's corporate representative gave this response notwithstanding that the antecedent debt issue again was specifically enumerated as one of the areas of inquiry in the Debtors' Rule 30(b)(6) Notice of Deposition of Prudential and Pruco, and the corporate representative was the sole person produced by both Prudential and Pruco to answer these questions. [15]

In contrast to Prudential and Pruco's strategy, the Bank Group did offer an explanation for its position that only some of the liens were granted on account of antecedent debt.  During her Rule 30(b)(6) deposition, Wachovia's corporate representative explained that the Bank Group's denial that the liens were transferred on account of antecedent debts of the Debtors was based solely on the Bank Group's contention that one of the Debtors that granted liens pursuant to the May 25, 2000 Documents - - *Furniture Company* - - "did not owe any antecedent debts and, therefore, the liens that Heilig-Meyers Furniture granted were not granted on account of antecedent debts."  Johnson Deposition, p. 249.

While the Debtors appreciate the Bank Group's attempt to explain its position, its justification for its denial cannot be supported and fails both as a matter of undisputed fact and undisputable law.  First, although Furniture Company was not a direct obligor under the Credit Agreement until May 25, 2000, it was the direct and primary obligor of each of the Wachovia

---

[15] Like the other issues that Prudential and Pruco's corporate representative refused to testify about, Prudential and Pruco obviously believe that the antecedent debt issue primarily presents a question of law which can be resolved solely by a review of the documents in this case and the legal arguments of counsel.  The Debtors' agree and for this reason maintain that the issues raised in this motion are ripe for resolution on summary judgment.

Synthetic Leases and the FUNB Synthetic Lease.  All of these Synthetic Leases were expressly included with the definition of "Secured Obligations" under the May 25, 2000 Security Agreement, and thus, in an of themselves, established the requisite antecedent debt owed by Furniture Company for purposes of Debtors' preferential transfer of liens claim.  See Exhibit 3B in Exhibit Book, pp. 2-3.

Beyond this fact, the Bank Group's denial that Furniture Company's liens were transferred on account of antecedent debts also fails as a matter of law because the denial represents a legal position which is impossibly contradictory to the position that Defendants asserted and *prevailed on* earlier in this proceeding.

In the Amended Complaint, the Debtors' included both a claim for preferential transfer under § 547(b) in regard to the Debtors' transfer of the liens to Defendants (Count II), as well as a claim for fraudulent transfer under § 548 in regard to the transfer of the liens (Count IV). Significantly, the preferential transfer count contained the specific allegation that the liens were transferred on account of antecedent debts, but the fraudulent transfer count did *not* contain nor incorporate that allegation.

In their Joint Motion to Dismiss the Amended Complaint, Defendants asserted that Count IV of the Amended Complaint, which alleged fraudulent transfer in respect of Debtors' transfer of the liens, was legally deficient and should be dismissed.  Defendants based this contention solely and exclusively on their adoption of the Debtors' allegation in the preferential transfer count that the liens were granted on account of antecedent debts owed by the Debtors and their application of that allegation to the Debtors' fraudulent transfer claim, notwithstanding that the fraudulent transfer count specifically did not incorporate the antecedent debt allegation. Defendants then argued that the liens granted by the Debtors could not constitute a fraudulent

transfer because of Defendants' contention that securing a previously unsecured antecedent debt constitutes sufficient value to preclude a fraudulent transfer action.

> The "Avoidable Liens" were not fraudulent for the same reason the "Avoidable Cash Transfers" were not fraudulent—they were granted on account of antecedent debts of the Debtors.

> The Bankruptcy Code states that value in the context of alleged fraudulent transfers includes "satisfaction or *securing* of a present or antecedent debt of the debtor . . . ."

Joint Memorandum in Support of Motion to Dismiss, p. 27.

In this Court's March 25, 2003 Order on Defendants' Motion to Dismiss and Memorandum Opinion, this Court accepted Defendants' argument over the opposition of the Debtors, and ordered the dismissal of the Debtors' fraudulent transfer count with regard to the transfer of the liens.  While recognizing that it was a "close call," this Court ultimately agreed with Defendants' contention that a debtor's transfer of liens on account of previously unsecured antecedent debts owed by the debtor did constitute sufficient value to bar the assertion of a fraudulent transfer claim by the debtor.

As is readily apparent, the Bank Group's current position that Furniture Company's grant of its liens pursuant to the May 25, 2000 Documents was *not* on account of antecedent debts owed by Furniture Company flies directly in the face of the argument they asserted and prevailed on in their motion to dismiss.  It is little more than a game of "heads I win, tails you lose" and cannot be countenanced in the context of a preference claim under section 547(b) and a fraudulent transfer claim under section 548.

Indeed, the case law illustrates just the opposite.  It provides that where a debtor transfers property on account of an antecedent debt owed "directly" by a third-party either the transfer will be deemed a transfer on account of antecedent debt owed by the debtor, and thus subject to a

preference claim under section 547(b), or the transfer will deemed as having occurred for less than reasonably equivalent value, and thus subject to a fraudulent transfer claim under section 548. Simply stated, a creditor cannot have it both ways. See e.g. In re Computer Universe, Inc., 58 B.R. 28, 31-33 (Bankr. M.D. Fla. 1986); In re Octagon Roofing, 124 B.R. 522, 527-529 (Bankr. N.D. Ill. 1991); In re Energy Savings Center, Inc., 54 B.R. 100, 103 (Bankr. E.D. Pa. 1985).

For instance, in Computer Universe, the Chapter 7 debtor, Computer Universe, was the wholly owned subsidiary of Industrial America Corporation ("Industrial America"), itself a Chapter 7 debtor. Computer Universe, 58 B.R. at 30. Industrial America owed Arthur Young for various accounting services that had been performed for Industrial America, but did not have the funds to pay the bill itself. Id. Instead, it caused Computer Company to transfer certain computer equipment to Arthur Young in partial satisfaction of the Industrial America outstanding debt to Arthur Young. Id. Computer Universe received no cash from Arthur Young in exchange for the transfer. Id. Instead, Computer Universe's debt to its parent, Industrial America, was reduced by the amount of the transfer to Arthur Young. Id.

The trustee for Computer Universe subsequently sought to avoid the transfer to Arthur Young as either a preferential transfer under § 547 or a fraudulent transfer under § 548. Id. In response, Arthur Young adopted the same contradictory position that the Bank Group has attempted to assert in this case. Id. at 31-32. It argued that Computer Universe received sufficient value to preclude a fraudulent transfer claim, but that the transfer was not on account of an antecedent debt owed by Computer Universe. Id. With regard to the lack of antecedent debt contention, the court explained:

> The plaintiff contends that although no direct debtor-creditor relationship existed between Computer Universe and Arthur

Young, Arthur Young became a *de facto* creditor by virtue of its entry into this triangle transaction. Arthur Young never intended to pay for the equipment. Instead, it intended and did use for its own benefit the antecedent debt to the debtor's insolvent parent. But for the existence of an antecedent debt available to Arthur Young, it would not have received the equipment. In effect, Arthur Young became the assignee of a portion of the Industrial America debt from Computer Universe even though there were no formal documents executed.

The definition of value contained in § 548(d)(2) shows that repayment of a debt will insulate a transferee from § 548 liability. The repayment of a debt, however, remains subject to the trustee's § 547 preference voiding powers. . . .

To the extent that Arthur Young claims that reasonably equivalent value passed to Computer Universe by virtue of the extinguishment of its debt to its parent, Arthur Young necessarily concedes that there has been a novation. Such novation substituted Arthur Young as the creditor for Industrial America thus meeting the "to a creditor" element of a preference. . . .

***Arthur Young cannot say that it is insulated from § 548 because the transfer was in repayment of a debt and from § 547 because it was not in repayment of a debt****.* Were the defendant's analysis to hold, an insolvent person facing bankruptcy could prefer creditors by using an insolvent intermediary or making arrangements with another prospective bankrupt to pay each other's preferred creditors.

Under both a legal and policy analysis, the transfer was, if not a transfer without consideration, a preference.

Computer Universe, 58 B.R. at 31-32 (emphasis added)(citations omitted).

Similarly, in Octagon Roofing, the court refused to allow the defendant to take inconsistent positions, and stated that defendant's antecedent debt defense for purposes of the fraudulent transfer claim barred the defendant from contesting that the transfer was not on account of the debtor's antecedent debt for purposes of the preferential transfer claim. Octagon Roofing, 124 B.R. at 529.

In <u>Energy Savings,</u> the court took a similar either/or approach.  <u>Energy Savings</u>, 54 B.R. at 102.  In ruling that the defendant's avoidance of preference liability merely meant that he must submit to fraudulent transfer liability, the court expounded "[a]lthough hardly an epic lawsuit, [the defendant] not having Ulysses' luck, has sailed clear of the Scylla of § 547(b) to be inguritated by the Charybdis of § 548 (a)." <u>Id.</u> at 103.

The application of the "either/or" rule discussed in each of these decisions is particularly warranted in this case.  Like the defendants in <u>Computer Universe</u> and <u>Octagon,</u> the Bank Group is trying to argue inconsistently both out of the fraudulent transfer and preferential transfer sides of its mouth.  However, unlike the defendants in <u>Computer Universe</u> and <u>Octagon</u> which were up front with their inconsistent arguments, the Bank Group, in this case, has played fast and loose with this Court.  First, the Defendants unilaterally elected to adopt and incorporate the Debtors' antecedent debt allegation from the preferential transfer claim into the fraudulent transfer claim.  Then, after Defendants had successfully procured the dismissal of the fraudulent transfer claim based on the very fact that the liens were indeed transferred on account of antecedent debts, the Bank Group for the first time surfaced the argument that the liens were not transferred on account of antecedent debt after all.

Again, the Bank Group cannot have it both ways.  Having elected to make the factual representation that the liens were transferred on account of antecedent debts in order to avoid the fraudulent transfer claim, they cannot now validly assert the opposite position to defeat the preferential transfer claim. See <u>e.g.</u> <u>United Virginia Bank v. B.F. Saul Real Estate Investment Trust</u>, 641 F.2d 185, 189-190 (4th Cir. 1980)(banks were judicially estopped from arguing that a security interest did not cover certain personal property where they had previously argued an inconsistent position and prevailed in their argument: "It was perfectly proper for the bankruptcy

court and district courts below to prohibit the banks from 'blowing hot and cold.'"). See generally King v. Thomas Memorial Hospital, 159 F.3d 192, 196 (4th Cir. 1998)("Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation. As we have previously observed, the doctrine is invoked to prevent a party from 'playing fast and loose with the courts,' . . . or from attempting 'to mislead the courts to gain unfair advantage.'").

For this reason as well, the Bank Group's denial that the liens were transferred on account of antecedent debts must be disregarded.[16]

## III.   WITH THE EXCEPTION OF THE BANK GROUP'S NEW VALUE DEFENSE, DEFENDANTS' AFFIRMATIVE DEFENSES TO THE PREFERENTIAL TRANSFERS FAIL AS A MATTER OF LAW

As affirmative defenses to both the preferential cash transfer claim in Count I of the Amended Complaint and preferential lien transfer claim in Count II of the Amended Complaint both the Bank Group and Prudential and Pruco have asserted (i) the contemporaneous exchange of new value defense under § 547(c)(1), (ii) the transfer in the ordinary course defense under § 547(c)(2), and (iii) the subsequent new value defense under § 547(c)(4). The Debtors' accept the Bank Group's subsequent new value defense under § 547(c)(4) to the extent of the cash advances made by the Bank Group under the Credit Agreement after the first transfer of the Berrios Proceeds on May 26, 2000. However, each of the other defenses asserted by the Bank Group and Prudential and Pruco either fail as a matter of law or are rendered academic by virtue of the new value defense.

---

[16] To the extent the Court allows Defendants to retreat or modify from their antecedent debt argument that they successfully raised in their motion to dismiss, the Debtors should be entitled to restore and have partial summary judgment entered on their fraudulent transfer of liens claim in Count IV of the Amended Complaint.

**A.    NEITHER THE BANK GROUP NOR PRUDENTIAL OR PRUCO GAVE THE DEBTORS CONTEMPORAEOUS NEW VALUE SUFFICIENT TO MEET THE CONTEMPORANEOUS EXCHANGE PROVISIONS OF SECTION 547(C)(2)**

According to Wachovia's corporate representative, the only new value that the Bank Group gave to the Debtors in exchange for the cash and lien transfers that the Debtors made to Bank Group during the preference period was the Bank Group's amendment to the Credit Agreement pursuant to the May 25, 2000 Documents.

> [I]f we had not come up with a new deal they would have been in default and they would have out—and there would have been no way for them to continue to operate.

Johnson Deposition, p. 295.

Prudential and Pruco's description of the "new value" which they purportedly gave to the Debtors in exchange for the preferential cash and lien transfers is even more revealing. According to Prudential and Pruco's corporate representative, the only "new value" which they gave to the Debtors in exchange for the transfers consisted of (1) their consent to the Berrios Sale (which, of course, resulted in Defendants receipt of in excess of $ 99 million); (2) their temporary modification of certain financial ratio compliance requirements under the Note Agreement; and (3) their agreement to allow the Bank Group to extend and modify the Credit Agreement pursuant to the May 25, 2000 Documents.  See Derrick Deposition, p. 160.

Neither the "new value" purportedly granted by the Bank Group nor the "new value" purportedly granted by Prudential and Pruco in exchange for the Debtors' transfers comes even remotely close to meeting the requirements for the contemporaneous exchange for new value defense under section 547(c)(1).   Rather, the purported "new value" touted by the Defendants falls squarely within a long line of cases which rejects the contention that forbearance in exercising pre-existing rights can constitute "new value."  See e.g. In re Air Conditioning, Inc.,

49

845 F.2d 293, 298 (11th Cir.1988)(creditor's release of right to seize debtor's inventory and property pursuant to new agreement reached with debtor could not constitute contemporaneous "new value": "An agreement by an undersecured creditor to forego its right to foreclose . . .cannot be treated as a new value under section 547 . . . . Forbearance from exercising pre-existing rights does not constitute new value under section 547."); <u>Drabkin v. A.J. Credit Corp.</u>, 800 F.2d 1153, 1159 (D.C. Cir. 1986)("We think it plain that a payment to an unsecured creditor in return for that creditor's agreement not to force the debtor into bankruptcy can never be treated as new value.  Otherwise the preference provisions of the bankruptcy code would be nullified, because all creditors could exact payments within the preference period under the exception."); <u>In re Jotan, Inc.</u>, 264 B.R. 735, 752 (Bankr. M.D. Fla. 2001)(entering into new agreement with debtor pursuant to which creditor waived certain purchase obligations and "oppressive terms" of earlier agreements did not constitute new value under section 547(c)(1) because forbearance of pre-existing rights as a matter of law cannot constitute new value); <u>In re Aero-Fastner, Inc.</u>, 177 B.R. 120, 138 (D. Mass. 1994)(rejecting creditor's assertion that forbearance from asserting pre-existing legal rights can constitute "new value"); <u>In re Rustia</u>, 20 B.R. 131, 135 (Bankr. S.D.N.Y. 1982)("the availability of additional credit by reason of the payments in question is no economic solace to the creditors of this estate. . . . An obligation substituted for an existing obligation is expressly excluded from the definition of new value in 11 U.S.C. section 547(a )(2)."). <u>See</u> <u>also</u> <u>Wolinsky v. Central Vermont Teachers Credit Union</u>, 98 B.R. 669, 684 (Bankr. D. Vt. 1989); <u>In re Trans Air, Inc.</u>, 78 B.R. 351, 354 (S.D.Fla. 1987); <u>In re Duffy</u>, 3 B.R. 263, 266 (Bankr. S.D. N.Y. 1980).

Much like the purported "new value" urged by Defendants here, cases like <u>Air Conditioning</u>, <u>Drabkin</u>, and <u>Jotan</u>, specifically involve creditors who urged that the renegotiation

or restructuring of prior agreements, and the waiver of rights pursuant to these new agreements should be considered "new value." <u>Air Conditioning</u>, 845 F.2d at 295; <u>Drabkin</u>, 800 F.3d at 1155; <u>Jotan</u>, 264 B.R. at 733-734    Notwithstanding the creditors' additional argument (much like Defendants' argument here) that these new agreements allowed the debtors "to stay open for business" or "avoid bankruptcy," the creditors' "new value" arguments were roundly rejected. <u>Air Conditioning</u>, 845 F.2d at 295; <u>Drabkin</u>, 800 F.2d at 1159; <u>Jotan</u>, 264 B.R. at 750-752.

Even under the most liberal reading of the "new value" requirement,[17] the alleged "accommodations" granted by the Bank Group and Prudential and Pruco under the May 25, 2000 Documents fall woefully short of the tangible economic benefit to the Debtors required to establish the contemporaneous exchange defense.    Indeed, other than the Bank Group's extension of the maturity date under the Credit Agreement and the temporary relaxation of certain coverage ratio requirements under the both Credit Agreement and the Prudential Note Agreement, virtually every economic term of the May 25, 2000 amendments to the Credit Agreements and the Prudential Note Agreement significantly favored Defendants over the Debtors.    For example, under the Credit Agreement the available credit line was reduced from $200 million to $140 million, and the availability of working capital was reduced from $200 million (less any letters of credit outstanding) to $45 million.    See Barden Affidavit, ¶ 14.    In addition, the interest rates under the Bank Group's credit facility were increased by two percentage points.    Id.

With regard to Prudential and Pruco's amendment of the Note Agreement, the Debtors were not even accorded the "benefit" of an extended maturity date.    To the contrary, in exchange for the Debtors' agreement to pay Prudential and Pruco what amounted to in excess of $20 million in Berrios Proceeds and to grant Prudential and Pruco lien rights in $ 42 million worth of

---

[17] <u>See</u> <u>e.g.</u> <u>In re. Buffalo Auto Glass</u>, 187 B.R. 451, 454 (W.D.N.Y.  1995).

collateral, Prudential and Pruco <u>accelerated</u> the maturity date from January, 2002 until July, 2001.  <u>See</u> Exhibit C to Barden Affidavit, ¶ 2.

Remarkably, not only did Defendants reap the extraordinary windfall of the Berrios Proceeds and the collateralization of the previously unsecured obligations, and not only did Defendants dramatically improve their position under the operative credit and note agreements, they exacted fees from the Debtors totaling $1,009,444 for the Bank Group and $200,000 for Prudential and Pruco.  <u>See</u> Barden Affidavit, ¶ 13.

For these reasons as well, Defendants' contemporaneous exchange of new value defense should be rejected.

**B.     THE BANK GROUP'S NEW VALUE DEFENSE IS VALID TO THE EXTENT OF ITS POST-MAY 25, 2000 ADVANCES**

According to Wachovia's corporate representative, the Bank Group gave the Debtors subsequent new value for purposes of section 547(c)(4) by continuing to make cash advances under the Credit Agreement during the preference period.  The Bank Group is correct.

As set forth on the Payment Schedule, beginning with the Debtors' first payment to the Bank Group during the preference period on May 23, 2000 the Bank Group made advances to the Debtors under the Credit Agreement totaling $107 million against payments by the Debtors during the same period of $136,256,677.  <u>See</u> Exhibit 7 in Exhibit Book.   The Debtors acknowledge that each of these advances by the Bank Group should be considered subsequent new value for purposes of section 547(c)(4) and thus should be credited against the Debtors' transfers to the Bank Group on a dollar for dollar basis.

Putting aside the Debtors' $6,000,000 to the Bank Group on May 23, 2000, which as discussed in the ensuing section of this memorandum is not appropriate for adjudication on summary judgment, this leaves a balance of preferential payments to the Bank Group in respect

of the Credit Agreement in the amount of $23,256,677.  Id. Adding the additional amount of $10,322,094 which represents the portion of the Berrios Proceeds that the Debtors transferred to Wachovia in respect of the Synthetic Leases (see Exhibit 6 in the Exhibit Book), this results in a net balance of preferential cash transfers relating to the Credit Agreement and the Synthetic Leases in the amount of $33,578,771.

C.    **PRUDENTIAL AND PRUCO'S SUBSEQUENT NEW VALUE DEFENSE IS MERITLESS**

Unlike the Bank Group, which continued to make advances to the Debtors during the preference period, Prudential and Pruco did not give the Debtors anything subsequent to the May 25, 2000 restructuring.  Indeed, according to Prudential and Pruco's corporate representative, the purported "new value" that Prudential and Pruco rely on for their subsequent new value defense is precisely the same "new value" that Prudential and Pruco claim as the basis for their contemporaneous exchange of new value defense, *i.e.* Prudential and Pruco's agreement to the May 25, 2000 Documents.   See Derrick Deposition, pp. 162-164.

The Debtors have already discussed the inadequacy of Prudential and Pruco's agreement to the May 25, 2000 Documents as a basis for their contemporaneous exchange of new value defense.  With regard to their subsequent new value defense, Prudential and Pruco's agreement to the May 25, 2000 Documents fails for an even more fundamental reason.

In order to meet the "subsequent" component of the subsequent new value defense, the purported new value must be given *after* the preferential transfers.  In this case, however, Prudential and Pruco's agreement to the May 25, 2000 Documents occurred by definition before the Debtors made the transfers of cash and liens to Prudential and Pruco.  Indeed, it was specifically pursuant to the May 25, 2000 Documents that the Debtors made the transfers to Prudential and Pruco in the first instance.

For these reasons, Prudential and Pruco's subsequent new value defense must be rejected out of hand, and the Debtors should be entitled to recover the full amount of the $20,654,171 that was transferred to Prudential and Pruco during the preference period.  See Exhibit 35 in Exhibit Book.

**D.     NONE OF THE DEBTORS' TRANSFERS OF CASH AND LIENS TO DEFENDANTS QUALIFIES UNDER THE ORIDINARY COURSE OF BUSINESS DEFENSE**

As discussed in the preceding sections of this memorandum, the Debtors made three categories of transfers during the preference period: (1) the $99,826, 829.48 of cash transfers that the Debtors made to Defendants representing the Berrios Proceeds; (2) the $67,406,112.52 of additional cash transfers that the Debtors made to the Bank Group under the Credit Agreement; and (3) the approximately $130 million of liens that the Debtors transferred to Defendants.  See Exhibits 6 and 7 of the Exhibit Book; Barden Affidavit, ¶¶ 9-11.  Neither the Bank Group nor Prudential or Pruco has suggested that the lien transfers by the Debtors were made in the ordinary course of business.  However, all of the Defendants contend that the Debtors' transfer of the Berrios Proceeds was in the ordinary course of the Debtors' business, and the Bank Group further contends that the additional payments under the Credit Agreement, as amended and restructured by the May 25, 2000 Documents, were made in the ordinary course of the Debtors' business.

With the possible exception of the Debtors' $6 million payment to the Bank Group on May 23, 2000, which the Debtors acknowledge cannot be determined for ordinary course of business purposes in the context of a motion for summary judgment, Defendants' ordinary course of business arguments are unavailing.  First, with respect to the Berrios Proceeds, the May 25, 2000 Intercreditor and Sharing Agreement specifically identifies the Berrios Sale as

occurring "other than in the ordinary course of business."  <u>See</u> Exhibit 3A to the Exhibit Book, p. 3 (definition of Non-Operating Cash Flow).

Defendants contend that the transfer of the Berrios Proceeds should be considered in the ordinary course of business notwithstanding the May 25, 2000 Documents because:

> [t]he sale of Berrios had become an ordinary course of business type of deal for Heilig since they had sold Rhodes, sold Mattress Discounters.  That over the last year or so asset sales to generate cash for debt repayment were ordinary course business affairs.

Johnson Deposition, p. 299.  <u>See also</u> Derrick Deposition, pp. 166-167.

Aside from the abject absurdity of the proposition that a company's ordinary course of business could ever be to sell itself off to pay creditors, Defendants ignore the fact that each of the two times (including Berrios) that Heilig-Meyers effectuated a sale of its subsidiaries it was required to enter into a specific intercreditor and sharing agreement with its creditors to determine the allocation of the proceeds.  The first time was with the April 1999 Intercreditor Agreement in connection with the sale by Heilig-Meyers of Rhodes and Mattress Discounter subsidiaries (<u>see</u> Barden Affidavit, ¶ 3), and the second time was with the May 25, 2000 Documents in connection with the Berrios Sale.  These facts alone negate any suggestion that the Berrios Sale and the transfer by the Debtors to Defendants of the Berrios Proceeds could ever possibly be considered as having occurred in the ordinary course of the Debtors' business.

With respect to the Bank Group's further contention that the Debtors' additional payments to the Bank Group were also made in the ordinary course of the Debtors' business, the fact that each of these payments was made pursuant to the Credit Agreement, as amended and restructured by the May 25, 2000 Documents, in and of itself also precludes the Defendants' ordinary course contention.

Moreover, even if Defendants were somehow able to overcome the out of ordinary course of business effect of the May 25, 2000 Documents,[18] the Debtors' acceptance of the Bank Group's subsequent new value defense renders the Bank Group's ordinary course of business defense essentially academic.    As this Court is well aware, the use of the Bank Group's advances as the basis for its subsequent new value defense precludes the double-counting of those advances as the basis for the Bank Group's ordinary course defense.   See generally, In re Matter of Kros. Brothers Dev. Co., 930 F.2d 648, 652-654 (8th Cir. 1991); § 547(c)(4)(B).

In view of the nature and timing of the Debtors' payments and the Bank Group's subsequent advances, the characterization of the advances either as advances on account of which the Debtors' made the preferential transfers or as subsequent new value will not have any impact on the net amount of the preferential transfers made by the Debtors to the Bank Group during the preference period.  In either case, the Bank Group is entitled to dollar for dollar credit for the full amount of its advances, and in either case the net amount of the Debtors' preferential transfers is $33, 578, 771 (inclusive of the preferential payments made in respect of the synthetic leases).

For these reasons, Defendants' ordinary course defense cannot apply to the Debtors' preference claims, and cannot reduce the net amount of these claims.

## CONCLUSION

Broken down to its basics, Defendants' position in this case is that the May 25, 2000 Documents and the FMAA do not mean what they say and should be completely disregarded in favor of a series of unspecified, ill-defined purported oral agreements and understandings.   Were it not for the seriousness of this proceeding and its importance to the resolution of the Debtors'

---

[18] As previously noted, among other things the Bank Group increased the interest rate on the Debtors' primary borrowing line by two percentage points  (see Barden Affidavit, ¶ 14), amounting to an increase of 30% over the prior rate.

bankruptcy, Defendants' position could not be taken seriously. Given the size and sophistication of all of the parties involved and the fact that the transactions at issue in this case involved literally hundreds of millions of dollars, Defendants' attempts to avoid their own documents and to hide behind oral "escrow" agreements and newly exhumed Letter of Credit Application forms speaks legions.

The Debtors recognize that the issuance of a summary judgment, or even a partial summary judgment, in a case of this magnitude is far from the norm. Nevertheless, the Debtors submit that the undisputed facts of this case, together with the overwhelming documentary support and controlling law, require just this result.

Accordingly, for the foregoing reasons and on the foregoing authority, the Debtors respectfully request this Court to issue a partial summary judgment in favor of the Debtors and against Defendants on all issues in Counts I and II of the Amended Complaint save for insolvency.

Respectfully submitted,

/s/ Bruce H. Matson
Counsel

Scott L. Baena (Fla. Bar No. 186445)
Robert W. Turken (Fla. Bar No. 306355)
Admitted pro hac vice
BILZIN SUMBERG BAENA
PRICE & AXELROD, LLP
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
(305) 374-7580

Special Counsel for the Debtors

and

Bruce H. Matson (Va. Bar No. 22874)
Troy Savenko  (Va. Bar No. 44516)
Katherine Macaulay Mueller (Va. Bar No. 44302)
LeCLAIR RYAN, A Professional Corporation
707 East Main Street, Suite 1100
Richmond, Virginia 23219
(804) 783-2003

Counsel for the Debtors

## CERTIFICATE OF SERVICE

Pursuant to the Local Rules of this Court, I certify under penalty of perjury that a copy of this document was served on July 23, 2003 by electronic mail on the following persons:

Kevin R. Huennekens, Esquire at
kevin.huennekens@kutakrock.com
Loc Pfeiffer, Esquire at
loc.pfeiffer@kutakrock.com
Kutak Rock LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500

Gregory J. Murphy, Esquire at
gregmurphy@mvalaw.com
Moore & Van Allen, PLLC
100 North Tryon Street, 47th Floor
Charlotte, North Carolina 28202-4003

David D. Hopper, Esquire at
ddhopper@chllh.com
Cook, Heyward, Lonnes, Lee & Hopper, P.C.
4551 Cox Road, Suite 210
P.O. Box 29629
Richmond, Virginia  23242

Bruce S. Meyer, Esquire at
bruce.meyer@weil.com
Weil, Gotshal & Manges
767 Fifth Ave.
New York, NY 10153

Bruce H. Matson, Esquire at
bmatson@leclairryan.com
LeClair Ryan, P.C.
707 East Main Street, Suite 1100
Richmond, VA 23219

/s/ Bruce H. Matson
Counsel