UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| HEILIG-MEYERS COMPANY, *et al.*, | ) | Case No. 00-34533 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| HEILIG-MEYERS COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 02-06158 |
| | ) | |
| WACHOVIA BANK, N. A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MOTION OF PRE-PETITION SECURED LENDERS
## FOR PARTIAL SUMMARY JUDGMENT

Wachovia Bank, National Association ("Wachovia"), for itself and as Administrative

Agent for the Bank Group, together with each member of the Bank Group, and The Prudential

Insurance Company of America and Pruco Life Insurance Company (collectively the "Pre-

Petition Secured Lenders"), hereby move this Court pursuant to Fed. R. Civ. P. 56, as made

applicable by Fed. R. Bankr. P. 7056, for partial summary judgment on two discreet sub-issues

affecting the determination of the solvency of Heilig-Meyers Company ("Heilig-Meyers" or the

"company") and its affiliated Debtors. In particular, the Pre-Petition Secured Lenders move the

Court for partial summary judgment establishing that (i) the appropriate valuation standard to be

used in the insolvency analysis for these Debtors is as a "going concern"; and (ii) the Pre-Petition

CHAR1\718149_1

14-39886.1/1

Secured Lenders have come forward with sufficient undisputed evidence of the Debtors' solvency as of the date of the relevant transfers to rebut the *initial* presumption of insolvency arising under section 547(f), thereby shifting to the Debtors the burden of going forward with evidence of insolvency, if any.   The Pre-Petition Secured Lenders submit that summary judgment on these sub-issues will streamline this litigation and the Court's ultimate determination of the Debtors' solvency as of the relevant dates.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Heilig-Meyers has an ancestry that can be traced back to 1913. (Defs.' Dep. Ex. 47, p. 15.) Its predecessors include numerous Virginia and North Carolina corporations, the first of which was incorporated in 1940. (Defs.' Dep. Ex. 45, p. 4.)  The company has always focused its business on the retail sale of home furnishings. *Id.* The company historically located its stores in smaller towns and rural markets, tailoring its business to lower and middle income consumers.  In doing so, Heilig-Meyers exploited a competitive advantage in that competition in these geographic areas was from predominantly locally-owned businesses which generally lacked the financial strength to compete. (*Id.* at p. 5.)

2.     Always central to Heilig-Meyers' business strategy was its offering of flexible credit options to its customers.  Historically, more than 70% of its retail sales were made through the company's offering of installment credit programs, often to customers that typically did not qualify for credit elsewhere. (*Id.* at p. 8; Shaffer Dep. at 37-40.)  This credit function was managed store-by-store, with each location being responsible for extending and collecting credit

---

[1] In support of this motion, Defendants rely on excerpts and exhibits from the transcripts of the depositions of Roy Goodman, Chief Financial Officer of the Debtors, taken on August 6, 2003 ("Goodman Dep."); Paige Wilson, Treasurer of the Debtors, taken on August 13, 2003 ("Wilson Dep."); Thomas Crump, Controller of the Debtors, taken on September 12, 2003 ("Crump Dep."); William DeRusha, CEO and Chairman of the Debtors, taken on September 3, 2003 ("DeRusha Dep."); and Donald Shaffer, President and COO of the Debtors, taken on August 20, 2003 ("Shaffer Dep.").  Defendants have submitted an appendix with this brief containing pages from deposition

in accordance with general corporate guidelines. (Defs.' Dep. Ex. 45, p. 8.) Uniquely, customers often paid their installments in person at their local store. (Shaffer Dep. at 42.)

3.     Over the years Heilig-Meyers expanded broadly beyond its original base in Virginia and North Carolina, through both a series of acquisitions and by penetrating new markets. (Defs.' Dep. Ex. 45, p. 4.) Among the larger acquisitions made by the company were its purchase in December 1996 of Rhodes, Inc., which was a publicly-traded furniture retailer having 105 stores in 15 states at the time of the acquisition, and its purchase of Mattress Discounters Corporation in 1997, which at the time operated 169 stores in 10 states. *Id.* By 1998, the consolidated company operated more than 1,200 stores in 30 states and reported total annual revenues exceeding $2 billion. It had become the largest furniture retailer in the United States. (*Id.*, pp. 4 – 5.)

4.     As Heilig-Meyers expanded, it developed a complex financial infrastructure which financed not only its acquisitions but also its day-to-day working capital needs. This financial structure included the following components:

(a)     In January 1995, MacSaver Financial Services, Inc., a wholly-owned subsidiary of Heilig-Meyers which was devoted to financing activities involving the consolidated companies ("MacSaver"), issued to Prudential and Pruco (collectively, "Prudential") $60 million of 11.99% Series A Guaranteed Senior Notes due 2002 (as amended from time to time, the "Prudential Notes"), pursuant to a Note Agreement dated as of January 13, 1995 among MacSaver, as issuer, Heilig-Meyers, as the guarantor, and Prudential as the purchaser of the notes. *See*, Final Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Providing the Pre-Petition Secured Lenders Adequate Protection, pp. 4-5, ¶ G.

(b)     On July 18, 1995, MacSaver, as borrower, and Heilig-Meyers, as guarantor, entered into a new Credit Agreement with Wachovia, as agent for the Bank Group, to provide up to $400 million in revolving loans and letter of credit facilities to MacSaver, Heilig-Meyers and its other

transcripts referenced herein as well as copies of all Defendants' deposition exhibits ("Defs.' Dep. Ex.") referenced herein.

subsidiaries (as amended from time to time, the "Bank Group Credit Agreement"). *Id.* at p. 4, ¶ F.

(c)   In January and August 1996, Heilig-Meyers Furniture Company, an operating subsidiary of Heilig-Meyers (the "Furniture Company"), entered into two "synthetic" lease arrangements with Wachovia (the "Wachovia Synthetic Leases"), structured as a "tax ownership operating leases" involving distribution centers, office buildings and other properties located in Richmond, Virginia, Hesperia, California, Mount Sterling, Kentucky, and Athens, Texas. The obligations of the Furniture Company under the Wachovia Synthetic Leases were guaranteed by Heilig-Meyers. (*Id.* at pp. 5-6, ¶ I.) The lessor under the Wachovia Synthetic Leases shall be referred to as the "Wachovia Synthetic Lessor".

(d)   In August 1998, the Furniture Company entered into a synthetic lease arrangement evidenced by a lease agreement and a trust agreement involving First Union National Bank (as amended from time to time, the "FUNB Synthetic Lease"). The obligations of the Furniture Company under the FUNB Synthetic Lease were guaranteed by Heilig-Meyers. (*Id.* at p. 5, ¶ H.) The lessor under the FUNB Synthetic Lease shall be referred to as the "FUNB Synthetic Lessor," and the Wachovia Synthetic Lessor and the FUNB Synthetic Lessor shall be referred to together as the "Synthetic Lessors."

(e)   MacSaver had issued three different series of unsecured notes aggregating $475 million, which were due in 2002, 2003 and 2007, and which were governed by an indenture agreement dated August 1, 1996. (Defs.' Dep. Ex. 45, p. 37.) Heilig-Meyers guaranteed the obligations under these notes. (Defs.' Dep. Ex. 45, p. 8.)

(f)   Heilig-Meyers developed a receivables securitization program through which MacSaver and Heilig-Meyers transferred, through true sales, the substantial majority of their consumer installment contracts to a Master Trust. (Defs.' Dep. Ex. 45, pp. 34 – 36; Goodman Dep. at 151 –152.) The securitization financing was critical to Heilig-Meyers because it allowed the company to convert to cash the installment sales contracts generated through its sales and also to retain an interest in the surplus value of the receivables sold into the program. (Defs.' Dep. Ex. 45, p. 22.)

5.   At all times relevant to this proceeding, Heilig-Meyers' common stock was publicly traded on the New York Stock Exchange under the symbol "HMY". Heilig-Meyers paid cash dividends on its stock in every year from fiscal 1976 through fiscal 2001. (Defs.' Dep. Ex. 45, p. 14.)

6.      In March 1999, as a result of deteriorating operating performance linked to its

inability to assimilate some of acquisitions, Heilig-Meyers announced that it would refocus on its

core operations and seek to divest its Rhodes division, its Mattress Discounters division, and

other non-core businesses. (Defs.' Dep. Ex. 45, p. 17.) Major divestitures followed. On July 13,

1999, Heilig-Meyers completed its sale of its Rhodes division for $60 million in cash and a $40

million note receivable due in 2004. *Id.* On August 6, 1999, Heilig-Meyers completed its sale of

its Mattress Discounters division, yielding $204 million in cash and promissory notes for

approximately $11 million. *Id.* On January 11, 2000, Heilig-Meyers sold substantially all of its

assets of its subsidiary Guardian Products, Inc., receiving $6 million in cash and a $5.1 million

note receivable. *Id.* On or about April 20, 2000, Heilig-Meyers sold substantially all of its assets

and business operations of two Puerto Rican subsidiaries (the "Berrios Subsidiaries") for

approximately $99 million in cash and a note receivable in the amount of $18 million. (*Id.* at p.

18.)  Proceeds from each of these divestiture transactions were used to repay Heilig-Meyers'

long term debt obligations. (Defs.' Dep. Ex. 46, Sld. 5.)

7.      The financial impact of these divestitures was dramatic. Between February 1999

and May 31, 2000, Heilig-Meyers' balance sheet debt fell by over $400 million, from $924

million to $516 million, a reduction of over 44%. *Id.* The company's overall leverage ratio,

defined as debt to total capitalization, was reduced to its lowest level in the preceding 10 years.

*Id.* Annualized interest costs were reduced by approximately $28 million. And the tangible net

worth of the company, as reported in its financial statements, improved approximately 43%. *Id.*

8.      As a result of the completion of the divestiture program, in 2000 Heilig-Meyers

had returned to a much simpler business model with two operating divisions. (Def. 47, p. 9;

Defs.' Dep. Ex. 45, p. 4.) Approximately 815 stores were operated under the traditional Heilig-

Meyers format and were located in small towns and rural markets in the Southern, Midwestern and Western continental United States. (Defs.' Dep. Ex. 45, p. 17; Defs.' Dep. Ex. 46, Sld. 7.) These stores continued to rely overwhelmingly on the installment credit (open-ended) program to fuel sales.    (Defs.' Dep. Ex. 45, p. 8.) The other operating division was comprised of approximately 56 stores under the RoomStore format, which used a "room-packaging" concept. (Defs.' Dep. Ex. 45, p. 17.) These stores were located in larger metropolitan markets and did not rely so heavily on the installment credit program, instead offering middle income customers revolving credit programs. (*Id.* at p. 5 and p. 8.) During calendar year 2000, the management of Heilig-Meyers developed and invested significant capital in extensive new initiatives designed to modernize these core operations, including updating the store formats, centralizing the credit function, and streamlining their merchandise purchases from vendors. (Defs.' Dep. Ex. 47, p. 10.)

9.    The Form 10-K filed by Heilig-Meyers with the Securities and Exchange Commission for the fiscal year ending February 29, 2000 reveals distinctly that Heilig-Meyers was demonstrating improved operating performance.  From its fiscal year 1998 (which ended February 28, 1998) through fiscal year 2000 (which ended February 29, 2000), Heilig-Meyers produced nearly a $90 million turnaround in its operating performance (measured as operating income before interest and taxes). (Defs.' Dep. Ex. 45, p. 47.) This Form 10-K also presents the consolidated balance sheet for Heilig-Meyers and its subsidiaries for the period ending February 29, 2000, and these statements report a positive shareholders' equity in excess of $534 million. (*Id.* at p. 15.) The accompanying financial statements were audited by Deloitte & Touche LLP, through its Richmond office, and their audit opinion certifies that these financial statements fairly present the financial condition of Heilig-Meyers and its subsidiaries. (*Id.* at p. 50.) The

audit does not contain any qualification that the auditors have substantial doubt about the ability of the company to continue to operate as a going concern. (*Id.*)

10.    Heilig-Meyers was not without financial challenges during this period. (Defs.' Dep. Ex. 31, 37.) The Bank Group Credit Agreement was scheduled to mature in May 2000. The FUNB Synthetic Lease was scheduled to mature in July 2000. The commitment termination date with respect to one of its series of securitization certificates was scheduled to occur in July 2000. Adding to the liquidity pressure that these maturities placed upon Heilig-Meyers, the company also faced the prospect of having to fund a $40 million "spread account" under its receivable securitization facilities in the event that its long-term unsecured debt rating fell below BB- by Standards & Poor's or below Ba3 by Moody's Investors Service, Inc. (*Id.*; Def. 45, p. 23.) The company also faced the operational challenges of successfully implementing its new strategic initiatives. (Defs.' Dep. Ex. 47, p. 8.)

11.    Against this backdrop, Heilig-Meyers entered into negotiations with the Bank Group, Prudential and the Synthetic Lessors which resulted in a comprehensive restructuring of their applicable credit facilities. On May 25, 2000, Heilig-Meyers and the Pre-Petition Secured Lenders executed a set of agreements, including:

(a)    Amendment No. 9 to the Credit Agreement (the "Ninth Amendment"); (Am. Comp. Ex. G.)

(b)    Security Agreement, which granted to Wachovia as collateral agent for the Pre-Petition Secured Lenders, security interests on certain accounts, general intangibles, and certain other forms of personal property[2]; (*Id.*, Ex. B.)

---

[2] In connection with its applications with Wachovia to issue standby letters of credit in connection with its workers compensations programs, Heilig-Meyers had granted certain security interests to Wachovia securing *inter alia* Heilig-Meyers' reimbursement obligations. (Johnson Dep. at 69.) To the extent that this security interest attached to account balances or deposit accounts maintained by the Debtors with Wachovia, security interest was perfected outside of the preference period. To the extent that this security interest attached to other personal property owned by the Debtors, security interest was perfected upon the filing of these UCC-1 financing statements.

(c)     Various mortgages, deeds of trust and UCC-1 financing statements;

(d)     the Intercreditor and Sharing Agreement (the "Intercreditor Agreement")
among Heilig-Meyers and the Pre-Petition Secured Lenders. (*Id.*, Ex. A.)

All but one of the UCC-1 financing statements were filed within ten (10) days of the execution

of the Security Agreement.[3] The majority of the mortgages were also recorded within ten days

of May 25, 2000, with the bulk of the remainder being filed shortly thereafter. (*Id.*) It is the

liens and security interests granted by the Debtors pursuant to the Security Agreement and the

Mortgages which is the focus of their preference attacks against the Pre-Petition Secured

Lenders. In addition, the Debtors seek to avoid allegedly $99 million in proceeds (the "Berrios

Proceeds") from Heilig-Meyers' divestiture of its Berrios Subsidiaries, which had been deposited

in the "MacSaver Non-Operating Escrow Account" on or about April 21, 2000 (Goodman Dep.,

pp. 85-86), and pursuant to the terms of the Ninth Amendment and the Intercreditor Agreement

were applied to the Debtors' obligations to the Pre-Petition Secured Lenders on May 25, 2000.

(Defs.' Dep. Ex. 23, p. 3.) The foregoing transactions, including the granting of the liens and

security interests by the Debtors and the application of the Berrios Proceeds, shall be referred to

collectively as the "May 25[th] Transactions".

12.     The Ninth Amendment was a critical achievement for Heilig-Meyers (Goodman

Dep., p. 128) because it resulted in (a) a one-year extension of its principal working capital credit

facility (Defs. Dep. Ex. 49, p. 16) and of the FUNB Synthetic Lease (Wilson Dep. at 154), (b)

relief under various financial covenants which Heilig-Meyers had previously violated (*Id.* at 17),

(c) an agreement for Heilig-Meyers to use as general working capital up to $20 million of

reserves which previously had been dedicated under the Credit Agreement solely to fund the

---

[3] The Debtors take the position in their expert's report that the liens were filed on May 25, 2000, and the Pre-Petition
Secured Lenders agree.

"spread account" in the event of a downgrade, and (d) an agreement for Heilig-Meyers to use prospectively up to an additional $20 million of proceeds from non-operating asset sales for general working capital purposes. (Defs.' Dep. Ex. 27, 28.)

13.   As of May 1, 2000, the market capitalization for Heilig-Meyers (based on the market price of its publicly traded common stock and the number of outstanding shares) exceeded $122 million. (Defs.' Dep. Ex. 45, p. 1.) On May 13, 2000, Heilig-Meyers continued its traditional practice of paying quarterly cash dividends to its shareholders, distributing $0.02 per share. (Defs.' Dep. Ex. 49, p. 6.)

14.   In its Form 10-Q filed with the Securities and Exchange Commission for the period ended May 31, 2000, Heilig-Meyers reported shareholder equity of a positive $518 million (*Id.* at p. 4.), the decline from the amount stated in the February 29, 2000 10-K being attributable primarily to mandated changes in accounting treatments. (*Id.* at p. 6.) For the three month period ending May 31, 2000, Heilig-Meyers recorded operating income before interest and taxes of more than $16.4 million. (Defs.' Dep. Ex. 40, p. 9) Revenues for the three-month period totaled $476.1 million, an increase of 0.7% versus pro forma revenues of $472.5 million for the same period in the prior year (adjusted for the divestitures). (Defs.' Dep. Ex. 44.) Comparable store sales for the period were unchanged. (*Id.*)

15.   In June 2000, Heilig-Meyers explored multiple options for refinancing the Bank Group Credit Agreement, with significant interest from several lenders, and for structuring a new asset securitization which would add Heilig-Meyers' new revolving credit accounts to the securitization pools, which had previously been comprised only of installment contracts. (Defs.' Dep. Ex. 56; Wilson Dep. at 191.) By mid-June 2000, Heilig-Meyers had submitted this securitization proposal to the rating agencies, who were then in due diligence analyzing the

proposal. (Defs.' Dep. Ex. 56.)  On June 21, 2000, Heilig-Meyers announced that Mr. Roy

Goodman, its Chief Financial Officer for the past several years, was leaving the company.

(Defs.' Dep. Ex. 46, Sld. 9.)  Mr. Goodman had been the central figure in negotiating the

company's restructuring with the Pre-Petition Secured Lenders and leading the company through

its divestiture programs.  (Shaffer Dep. at 59; Defs.' Dep. Ex. 46, Sld. 9.)  No immediate

replacement was announced.

16.    The company missed its budgeted sales targets for the month ending June 30,

2000 by approximately $11 million.  This decline in sales during June 2000 resulted in an

operating loss, before interest and taxes, of approximately $3.8 million for the month.

Management speculated that these declines could be attributable either to seasonal influences

(Wilson Dep. at 200) or to shortcomings in the company's advertising programs (Shaffer Dep. at

176.)

17.    By July 2000, Heilig-Meyers continued to have significant cash available, with

bank account balances of approximately $4 million and excess availability under the Bank Group

Credit Agreement of approximately $50 million. (Defs.' Dep. Ex. 62.)  The company was current

with all of its vendors and not in payment default on any financial obligations.  *Id.*  During the

month of July, the company successfully extended by one year its July 18, 2000 maturity under

its receivable securitization program. (Defs.' Dep. Ex. 64.)

18.    Throughout the month of July 2000, the company continued to anticipate a

downgrade in its long-term unsecured bond rating, projecting a "liquidity crisis" in the event of

such a downgrade if it did not liquidate non-core assets. (Defs.' Dep. Ex. 62.)  No steps to

liquidate non-core assets were taken, however.  The company instead retained the services of

Lazard Freres & Co. ("Lazard") (Defs.' Dep. Ex. 60), and Lazard began to urge the Board of

Directors to consider a bankruptcy filing. (Defs.' Dep. Ex. 63, 64.) As Ms. Wilson, the Treasurer of Heilig-Meyers, recounted Lazard's advice, Lazard offered four alternatives: "bankruptcy, bankruptcy, bankruptcy and bankruptcy." (Wilson Dep. at 217.) In view of the board's decision to hire Lazard, and his vehement disagreement with their recommendations, Mr. DeRusha, the Chairman and Chief Executive Officer, resigned (DeRusha Dep. at 181-186), creating termination obligations for the company in the approximate amount of $8 million. (DeRusha Dep. at 205; Defs.' Dep. Ex. 63, p. 6.)

19.   On August 1, 2000, the company announced that it had hired Lazard, that it was considering its strategic alternatives, and that it was deferring its payment of approximately $18 million in interest due under its unsecured note indenture. (Defs.' Dep. Ex. 69, p. 9.) As a result, the rating agencies immediately responded with downgrades in the company's long-term bond rating (*Id.*), thereby triggering Heilig-Meyers' obligation to fund $40 million into the "spread account" under its receivable securitization. (Wilson Dep. at 86.)

20.   Facing the new obstacles of Mr. DeRusha's unexpected resignation, the resulting $8 million termination liability to him, the self-inflicted downgrade in its long-term unsecured debt rating, and resulting defaults under the Bank Group Credit Agreement, and under the guidance of Lazard as its new financial advisor, Heilig-Meyers filed for bankruptcy protection under Chapter 11 of the United States Code on August 16, 2000.

21.   The company's bankruptcy filing caused its receivable securitization programs to terminate (Defs.' Dep. Ex. 69, p. 13), and, incredibly, the company did not have in place any ready alternative to convert newly generated installment sales contracts, upon which the business had historically depended, to cash[4]. The company therefore terminated its installment sales

---

[4] The Board Minutes reflect the Company, Lazard and the Company's lawyers recognized this was a problem in bankruptcy but could not come up with a solution. (Defs.' Dep. Ex. 63, p. 4-5). The Company filed anyway.

program, ceasing for the first time in its 87-year history to offer customers in-house installment sale credit. *Id.* Predictably, the company's sales plummeted, experiencing 40%-50% declines. (Defs.' Dep. Ex. 86, p. 2.) The decision to terminate the installment sales program also caused the company to re-evaluate the viability of stores in its traditional Heilig-Meyers format, and the company concluded that 302 stores would need to be closed immediately because they could not be operated without the installment credit program. (*Id.*; Wilson Dep. at 259-260.) Because the company's customers had historically paid their installment contracts at local stores, the decision to close more than one-third of the company's store base triggered a tremendous rise in delinquent customer payments. (Goodman Dep. at 188; Defs.' Dep. Ex. 69, p. 27.)

22.    In its Post-bankruptcy Form 10-Q, filed on November 27, 2000, reporting for the quarter ending August 31, 2000, the company's financial statements reflect "reorganization items" totaling $575 million. (Defs.' Dep. Ex. 69, pp. 10 – 11.) These items are specifically tied to the company's decision to close the 302 retail stores, to exit its historic installment credit function, and to reduce the carrying amount of assets to their net realizable value in the bankruptcy context. *Id.* Giving effect to these $575 million in bankruptcy-related charges, for the first time the company's shareholders equity turned negative by $75 million. (*Id.* at p. 5.)

## SUMMARY JUDGMENT STANDARDS

There can be no reasonable disagreement about the standards for partial summary judgment applicable to this adversary proceeding. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Courts analyze motions for partial summary judgment, which streamline the issues for trial, by the same standards that govern motions for full summary judgment. *Gill v. Rollins Protective Svcs. Co.*, 773 F.2d 592 (4th Cir. 1985).

The moving party bears the initial responsibility of identifying the lack of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to the non-moving party to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Ryder v. Philip Morris*, 946 F. Supp. 422, 427 (E.D. Va. 1996) (quoting *Celotex*, 477 U.S. at 324). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Partial summary judgment is proper when the non-movant fails to meet its burden, rendering the particular issue undisputed for the purposes of trial. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

I.  **SINCE THE DEBTORS WERE NOT ON THEIR FINANCIAL "DEATHBED" OR IN IMMINENT DANGER OF LIQUIDATION AT THE TIME OF THE RELEVANT TRANSFERS, THE INSOLVENCY DETERMINATION MUST BE BASED ON A "GOING CONCERN" VALUATION OF THE DEBTORS' ASSETS AND LIABILITIES.**

The centerpiece of the Amended Complaint is Counts I and II, which seek to avoid as alleged preferences pursuant to 11 U.S.C. §547(b) certain cash payments and liens allegedly transferred by the Debtors allegedly during the 90 days prior to the Petition Date.   These allegations of avoidable preferences integrally depend on the Debtors' assertion that they were "insolvent" at the time the respective transfers were made.[5]   (Am. Comp. ¶¶ 49, 56.)   For purposes of §547(b), the time of the transfer is determined by reference to §547(e), which provides that the date of perfection of the transfer is the time when the transfer is deemed made under §547 for the purpose of determining insolvency.   If security interests and liens are perfected within 10 days of being granted by the debtor, then the date of the transfer relates back to the conveyance; if security interests and liens are perfected after such 10 day period, then the actual date of perfection determines the date of the transfer.   *See* 11 U.S.C. §547(e)(2)(A) and (B).

Because the vast amount of the security interests and liens granted by the Debtors were perfected by UCC-1 filings and real estate recordations within this 10-day period after the May 25th Transactions and because the Debtors contend that the transfer of the Berrios Proceeds

---

[5] The Amended Complaint fails to differentiate among the different Debtors either in terms of identifying which Debtor or Debtors made particular transfers or which Debtor or Debtors were insolvent at the time such transfers were made. Due to this treatment by the Amended Complaint, for purposes of this Motion, the Pre-Petition Secured Lenders shall treat the Debtors as consolidated simply for determining whether the consolidated companies were functioning as a going concern or were on their financial deathbed.

allegedly occurred no later than May 25, 2000,[6] the effective date for determining the solvency

or insolvency of the transfers which are the subject of Counts I and II of the Amended Complaint

is May 25, 2000.

A.    *GOING CONCERN VERSUS DEATHBED LIQUIDATION STANDARDS OF*
       *VALUATION.*

Pursuant to §101(32) of the Bankruptcy Code, a corporate debtor is "insolvent" if it has a

financial condition "such that the sum of such entity's debts is greater than all of such entity's

property, at a fair valuation, exclusive of [certain exempt property enumerated in the statute]."

In other words, the Bankruptcy Code imposes a "balance sheet" test for the purpose of

determining the solvency or insolvency in a preference action. *See, e.g., In re DAK Indus., Inc.,*

170 F.3d 1197 (9th Cir. 1999); *In re Taxman Clothing Co.,* 905 F.2d 166, 169-170 (7th Cir. 1990).

The overwhelming consensus in the case law is that this "fair valuation" of assets and liabilities

should generally be made applying going concern valuation principles. *See, e.g., In re Miller &*

*Rhoads, Inc.,* 146 B. R. 950, 955 (Bankr. E.D.Va. 1992); *In Re Trans World Airlines, Inc.,* 134

F.3d 188, 193 (3rd Cir. 1998); *Taxman,* 905 F.2d at 170; *In re DAK Indus., Inc.,* 195 B.R. 117

(Bankr. C.D. Cal. 1996), *aff'd,* 170 F.3d 1197 (9th Cir. 1999)*; In re Mama D'Angelo, Inc.,* 55

F.3d 552, 556 (10th Cir. 1995); *In re Schwinn Bicycle Co.,* 192 B.R. 477, 485 (Bankr. N.D. Ill.

1996); *In re International Club Enterprises, Inc.,* 109 B.R. 562, 567 (Bankr. D.R.I. 1990); *In re*

*A. Fassnacht & Sons, Inc.,* 45 B.R. 209, 217 (Bankr. E.D. Tenn. 1984); *In re Art Shirt Ltd., Inc.,*

93 B.R. 333, 341 (E.D. Pa. 1988); *In re Vadnais Lumber Supply, Inc.,* 100 B.R. 127, 131 (Bankr.

D. Mass. 1989); *In re Bellanca Aircraft Corp.,* 56 B. R. 339 (Bankr. D. Minn. 1985.) *See also,* 2

COLLIERS ON BANKRUPTCY (15th ed.) ¶ 101.32, pp. 101 – 123.

---

[6] The Pre-Petition Secured Lenders do not agree, as explained in their response to the Debtors' motion for partial
summary judgment.

The only exception recognized in these cases for applying a liquidation standard in the insolvency determination is where the debtor "is on its deathbed" or nominally in existence at the time the subject transfers are made. *See, e.g., Miller & Rhoads*, 146 B.R. at 956; *DAK Industries*, 195 B.R. at 124; *Art Shirt*, 93 B.R. at 341. "To treat such a company as a going concern would be misleading and would, in fact, fictionalize the company's true financial condition." *Id.* Different courts have characterized this exception in varying ways, all of which share the common thread of a company in the throes of its imminent demise. Many courts use the "on its deathbed" characterization[7], while others look for a company whose liquidation is "clearly imminent"[8] or a company which is "only nominally in existence". As summarized by one court, however,

> a business does not have to be thriving to receive going concern valuation. Before the going concern valuation is to be abandoned, the business must be 'wholly inoperative, defunct or dead on its feet.'

*Art Shirt*, 93 B.R. at 341 (citation omitted). "Caution should be taken not to consider property as 'dead' merely because hindsight teaches that the debtor was traveling on the road to financial ruin." *Taxman*, 905 F.2d at 170 (quoting 2 COLLIER'S ON BANKRUPTCY).

A sampling of decisions in which a liquidation standard was applied is instructive because it conveys the dire financial condition necessary for the appropriate application of this valuation standard. These decisions are typically marked by debtors whose bankruptcy filings are promptly followed by complete liquidation. In *A. Fassnacht & Sons, supra*, the debtor operated for less than five months before converting to chapter 7. In *Mama D'Angelo, supra*, the

---

[7] *See, e.g., In re Art Shirt*, 93 B.R. at 341; *Miller & Rhoads*, 146 B.R. at 355; *DAK Indus.*, 195 B.R. at 124; *Schwinn Bicycle*, 192 B.R. at 486.
[8] *See, e.g., Trans World Airlines*, 143 F.3d at 193; *DAK Indus.*, 195 B.R. at 124.

case converted to chapter 7 within six months of filing[9]. In *Schwinn Bicycle*, the debtor and its

creditors agreed to liquidate the debtor's assets "[w]ithin a month after the filing" and the debtor

operated only "a few months" as it liquidated in an orderly manner.[10]   192 B.R. at 483.   In

*International Club Enterprises, supra*, the debtor was placed into receivership within only a few

weeks after opening for business, and its subsequent chapter 11 case was converted to chapter 7

liquidation in less than two months after its filing.[11]   And in *Miller & Rhoads, supra*, the debtor

operated post-petition for only four months before filing a plan of liquidation.   Clearly, there is

no talismanic inquiry justifying the application of the liquidation standard in the insolvency

analysis.   However, an immediate post-petition demise of a debtor, despite the buffers afforded

by chapter 11, is suggestive of a highly dubious financial condition existing during the

preference period, thereby justifying the use of the liquidation standard.   Conversely, where a

debtor reorganizes in chapter 11 or has a prolonged experience as a debtor-in-possession, the

application of the liquidation valuation standard in the insolvency analysis has been deemed

legally improper.   As stated by the bankruptcy court in *DAK Industries*, 195 B.R. at 125:

> Although a struggling debtor, with a few last gasps, could limp along for a few
> months after filing bankruptcy, it is difficult to conceive that a terminally ill
> business could forestall its inevitable demise for two and one-half years.   This
> ongoing effort, taken together with the fact that DAK's statements and schedules
> reflected a solvent debtor, leads this court to the inescapable factual conclusion
> that DAK was a going concern at the time of the transactions questioned . . . .

---

[9]In this case, the court commented that the debtor suffered "enormous and continuous operating losses," that the debtor was "a financial disaster" and "moribund" with an inherently defective manufacturing process, and that it continued to be kept afloat only by the infusion of shareholder loans. 55 F.3d at 555-56.

[10] In this case, the debtor "had suffered substantial losses and was experiencing a severe cash crisis . . . . It could not then meet its obligations, especially obligations to its product suppliers. The Debtor was on the verge of having to close its doors when it filed in bankruptcy." 192 B.R. at 481. The court further explained that the debtor's auditors issued a going concern qualification in the most recent annual audit prior to the bankruptcy, that the debtor's sales and gross profit margins fell dramatically to unsustainable levels, and that the debtor could not afford to continue operations because it could not replenish inventory. *Id.*

[11] As stated by this court, "it is undisputed that the debtor's business operations lasted at most for only six weeks, that a going concern value had not been established, and that at the time the transfers were made the corporation was already in receivership". 109 B.R. at 568.

In *DAK Industries*, the debtor operated as a debtor-in-possession for 30 months until being converted to chapter 7 for liquidation. After surveying the case authority, the bankruptcy court commented that "this court was immediately struck by the complete absence of any cases in which the debtor-in-possession operated for such a lengthy period of time" and the valuation standard was at issue. *Id.*

B.    *THE MILLER & RHOADS PRECEDENT.*

This Court's decision in *Miller & Rhoads* provides an insightful roadmap to the critical financial indicia relevant to determining whether a debtor was on its financial "deathbed". In its decision, this Court enumerates the financial failings of the debtor prior to its bankruptcy filing:

- Miller & Rhoads ("M&R"), a regional department store chain, was in payment default under its principal credit agreement and in violation of various loan covenants;

- M&R's auditors refused to issue financial statements without a going concern qualification;

- M&R's auditors prepared financial statements showing significantly *negative* shareholder equity ($16 million), presumably prepared according to Generally Accepted Accounting Principles, for the annual period immediately preceding the bankruptcy filing;

- M&R was losing money in every store on an operating basis;

- M&R's inventory levels, sales levels, gross profit margins, operating expenses, and capital expenditures were "all well below industry average" so that M&R "was at a competitive disadvantage in every area of retail performance";

- M&R's cash flow was insufficient to meet its immediate obligations;

- M&R's vendors were restricting or eliminating their credit lines to M&R; and

- M&R required an immediate equity capital infusion of at least $20 million, which was never forthcoming, just to continue to operate as a going concern.

146 B.R. at 952-54. On this record, this Court concluded that M&R was "no longer financially viable" at the time of the challenged transfers and "liquidation was imminent when the petition was filed". *Id.* at 955-56. This Court accordingly applied liquidation values in its analysis of M&R's financial condition during the preference period. This analysis has been cited approvingly in subsequent decisions (*see, e.g., DAK Indus.*, 195 B.R. at 124; *Schwinn Bicycle*, 192 B.R. 486) and reinforces the bedrock bankruptcy principle that the "fair valuation" of the debtor's assets and liabilities, to be conducted in an insolvency determination, requires a going concern analysis, *unless* the debtor is on its financial deathbed and its liquidation is imminent at the time the challenged transfers were made.

    C.    *THE DEBTORS' EXPERT REPORT VACILLATES ON THE GOING CONCERN STANDARD TO JUSTIFY USING LIQUIDATION DATA TO FORM HIS OPINIONS.*

In the recently submitted report of Jonathan Cleveland, Mr. Cleveland states:

> This report makes an assessment of insolvency under an assumed sale of each marketable asset (the "Balance Sheet Test").

> For illustrative purposes we have made an assessment of solvency under an assumed going-concern sale of the retail furniture business....

> Heilig-Meyers was insolvent...under any credible application of any arguably applicable standard (without conceding the applicability thereof).

By badly equivocating, it is unclear what standard he wishes the Court to believe he is applying. However, what is crystal clear from an analysis of the report itself, he uses going out of business sales, bankruptcy liquidation sales and auctions in order to arrive at his "insolvency" conclusion. In short, he has said he is valuing a going concern, but he has actually only valued a company on its deathbed and in liquidation. This is the improper standard.

D.   *HEILIG-MEYERS OPERATED AS A GOING CONCERN AS OF THE MAY 25TH TRANSACTIONS.*

From every reasonable perspective, the undisputed evidence, from the Heilig-Meyers' own officers and financial data, demonstrates that at the time of the subject transfers the Debtors (i) were enjoying improved operating results flowing from their divestiture strategy, (ii) had received an unqualified audit opinion on their most recent financial statements (issued just weeks before) showing more than $500 million in shareholders' equity, (iii) had solved their immediate liquidity challenges, (iv) were implementing dynamic new initiatives to centralize their credit functions, modernize their store format and improve their merchandising, (v) had ready access to the financial markets and the continued support of their vendors, and (vi) had no expectation or foreseeable need to seek bankruptcy relief or to liquidate any significant portion of their properties. The Debtors continue to this day, more than three years after the subject transfers, to operate post-petition as debtors-in-possession, albeit on a significantly downsized basis, and look to file a plan of reorganization, there having been repeated statements and findings in court orders and other pleadings that the Debtors continue to operate as a "going concern." As shown below, on this undisputed evidence, the Pre-Petition Secured Lenders are entitled to partial summary judgment on the issue that the Debtors were not on their financial "deathbed" at the time of the subject transfers and that therefore the insolvency determination in this litigation must be performed using going concern valuation principles and not liquidation analyses.

    1.    **Heilig-Meyers' Audited Financial Statements For The Fiscal Year 2000 State Shareholders Equity As *Exceeding $534 Million* And Contain No "Going Concern" Qualification By Its Independent Public Auditors.**

Among the factors most starkly dividing Heilig-Meyers from the "deathbed" cases are the results of its audited financial statements for fiscal year 2000, which ended February 29, 2000,

less than three months before the May 25th Transactions.  These statements report aggregate

shareholders' equity of *positive $534,748,000* as of February 29, 2000. (Defs.' Dep. Ex. 45.)

This $534 million of shareholders equity was based on total assets exceeding $1.4 billion and

total debt of $608,945,000.  (*Id.* at 15.)  The financial statements reporting these results were

audited by Deloitte & Touche LLP, which issued a letter to the shareholders and directors of

Heilig-Meyers, dated March 22, 2000, confirming the results of its audit, stating:

> We have audited the accompanying consolidated balance sheets of Heilig-Meyers
> Company and subsidiaries as of February 29, 2000 and February 28, 1999, and the
> related consolidated statements of operations, stockholders' equity, and cash flows
> for each of the three fiscal years in the period ended February 29, 2000 . . . . We
> conducted our audits in accordance with auditing standards generally accepted in
> the United States of America.  Those standards require that we plan and perform the
> audit to obtain reasonable assurance about whether the financial statements are free
> of material misstatement.  An audit includes examining, on a test basis, evidence
> supporting the amounts and disclosures in the financial statements.  An audit also
> includes assessing the accounting principles used and significant estimates made by
> management, as well as evaluating the overall financial statement presentation.  We
> believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, such consolidated financial statements presently fairly, in all
> material respects, the financial position of Heilig-Meyers Company and subsidiaries
> as of February 29, 2000 and February 28, 1999, and the results of their operations
> and their cash flows for each of the three fiscal years in the period ended February
> 29, 2000 in conformity with accounting principles generally accepted in the United
> States of America.

(*Id.* at 40.)  Significantly, the independent auditors' report did not include any "going concern"

qualification or exception.  *Id.*  Such qualifications are commonly expressed by independent

auditors when they develop substantial doubt whether the audited company will be able to

continue to operate as a going concern for the next twelve months and meet its obligations. *See,*

*Miller & Rhoads*, 146 B.R. at 953.

In his deposition testimony, Mr. Roy Goodman, the Chief Financial Officer of Heilig-Meyers, confirmed that audited financial statements were accurate in all respects and that Deloitte & Touche has never amended its clean audit opinion:

> Q:    And in the independent auditor's report Deloitte & Touche issued what they call a clean audit opinion, correct?
>
> A:    That's right.
>
> Q:    And there was no going concern qualification to their opinion, was there?
>
> A:    That's correct.
>
> Q:    Did they ever amend that opinion?
>
> A:    Not to my knowledge.
>
> Q:    As you sit here today [August 6, 2003], are you aware of any way of [sic] which this is now inaccurate.
>
> A:    No.

(Goodman Dep. at 244.)

On May 30, 2000, *after the May 25th Transactions closed*, the senior officers of Heilig-Meyers provided Deloitte & Touche a letter confirming the accuracy of financial information to be included in Heilig-Meyers' Form 10-K, to be filed by Heilig-Meyers with the Securities and Exchange Commission. (Defs.' Dep. Ex. 48.) By this letter, Heilig-Meyers' chief executive officer, chief financial officer, and controller each confirmed, among other points, that the audited financial statements for fiscal 2000 "present fairly the financial position, results of operations, and cash flows of the Company for the periods given" and "no events have occurred subsequent to February 29, 2000 that have a material effect on the financial statements that are in the Form 10-K or that should be disclosed in order to keep those statements from being misleading except [with respect to the completion of the Berrios divestiture and the extension of

the Bank Group credit facility for an additional year]." *Id.* The 10-K filed by Heilig-Meyers

with the Securities and Exchange Commission for the fiscal quarter ending May 31, 2000 states

Heilig-Meyers' consolidated shareholders equity as exceeding $514 million and contains no

suggestion that the company has suffered any material deterioration in its financial condition so

as to threaten its status as a going concern. (Defs.' Dep. Ex. 49.)  These admissions provide

undisputed evidence that the financial condition of Heilig-Meyers *as of the May 25th*

*Transactions* suffered no material change from its financial condition set forth in the audited

fiscal 2000 financial statements, statements which affirmed shareholders' equity as exceeding *a*

*half billion dollars* and received the unqualified opinion of its independent auditors.

> **2.      Heilig-Meyers Had Successfully Implemented Its Divestiture Strategy
> To Improve Its Operating Results And Its Overall Financial
> Condition.**

During fiscal year 2000 (which ended February 29, 2000), Heilig-Meyers was in the

midst of successfully completing a major divestiture strategy designed to improve its operations

and financial health.  This divestiture strategy dates back to March 1999, when Heilig-Meyers

decided to return to its core businesses – the formats of the classic Heilig-Meyers store and of the

RoomStore division -- and to shed divisions which it was unable to run profitably.  (Def. Dep.

Ex. 49.)  This strategy focused principally on selling the Rhodes Furniture division, the Mattress

Discounters division, and the Guardian Products, Inc. subsidiary.  All of these initiatives were

completed during fiscal year 2000, and resulted in Heilig-Meyers' receipt of approximately $270

million in cash proceeds and other non-cash consideration. *Id.*  In the fiscal 2000 Annual Report

to Shareholders, Mr. Roy Goodman, the Chief Financial Officer for Heilig-Meyers, evaluated the

significance of these divestitures to Heilig-Meyers' overall financial condition:

> Over the last 12 months, our goal has been to recapture financial
> flexibility and reposition Heilig-Meyers for future growth.  The decision to

divest non-core and unprofitable operating units was primarily driven by this repositioning strategy. By reinvesting our financial capital, human resources, and technology in our core business, we expect to build a stronger bottom line and generate a greater return on investment for our shareholders.

Based on the results to date, we believe the Company has been very successful in executing its refocusing strategy. During the past fiscal year, we sold our Rhodes and Mattress Discounters divisions, Guardian Protection Products, as well as certain assets associated with the 18 Heilig-Meyers stores in Chicago and Milwaukee. Valued at $373 million [in cash and non-cash consideration], the proceeds from these divestitures lowered overall debt by approximately 30 percent, significantly improving the tangible worth of the Company. The bottom line: an improved balance sheet and the financial flexibility to invest capital in our turnaround plan for the remaining core business.

*Where are we today? We have a better balance sheet, lower debt, fewer distracting operating divisions, improved operating results and a simpler business model. We're refocusing on our core business and reinvesting in projects that are going to re-ignite growth in order to bring our core operating format to a higher level of profitability.*

(Defs.' Dep. Ex. 47, p. 9 (emphasis added).)   In his recent deposition in this litigation, Mr. Goodman confirmed the accuracy of these remarks. (Goodman Dep. at 240.) These remarks also reinforce statements made by Mr. DeRusha, the company's Chief Executive Officer, indicating that the divestitures had resulted in lowering total debt by 44%, reducing the company's leverage ratio to its lowest level in 10 years, reduced interest expense by $28 million on an annual basis, and improved tangible net worth by 43%. (Defs.' Dep. Ex. 46.)

The financial data accompanying the Annual Report substantiates Heilig-Meyers' statements that its divestiture strategy was producing immediate improvements in its operating results and financial condition. Heilig-Meyers "evaluates its [financial] performance based on pre-tax earnings (loss) before interest and income taxes (based on generally accepted accounting principles)". (Defs.' Dep. Ex. 47, p. 38.) In fiscal year 2000, Heilig-Meyers' earnings before interest and taxes (inclusive of the RoomStore operations and exclusive of the divested

operations) totaled $85,699,000, a marginal improvement over the fiscal year 1999 result (where

such earnings were $85,189,000) and a dramatic improvement over the comparable earnings for

fiscal 1998, where Heilig-Meyers experienced a net *loss* before interest and taxes of $4,767,000.

*Id.* This data demonstrates that, *in the span of less than two years, Heilig-Meyers improved its

annual operating earnings by nearly $90 million.* During the same two year span, revenues

from the core operations (exclusive of the divested operations) increased from $1.773 billion

during fiscal year 1998 to $2.009 billion in fiscal year 2000. *Id.* Revenue increases for the chain

were attributable both to growth in the number of stores being operated and to improvements in

the sales from comparable stores open throughout the period. (*Id.* at 44.) Certainly, while

Heilig-Meyers continued to report a net loss for fiscal 2000 after inclusion of the effect of

extraordinary items, taxes, interest and depreciation, its revenues and operating earnings[12]

showed dramatic improvement traceable to its successful implementation of its divestiture

strategy.

These improvements in Heilig-Meyers' operating earnings and revenues were not mere

flashes in the pan. Heilig-Meyers' operating results for March, April and May 2000 plainly

demonstrate a continuing pattern of operating profitability. For the month of March 2000, the

consolidated operating earnings before interest and taxes was $5.754 million on sales of over

$147 million. (Defs.' Dep. Ex. 38, p. 7.) For April 2000, such earnings were $1.584 million on

sales of over $132 million. (Defs.' Dep. Ex. 39, p.7.) And for May 2000, consolidated operating

earnings before interest and taxes grew to $9.147 million on sales of over $141 million (Defs.'

Dep. Ex. 40, p. 7), leading Mr. Goodman to acknowledge that May 2000 was a "strong month"

---

[12] The measures in tangible improvement in Heilig-Meyers' financial condition during this period are not limited
simply to operating earnings or revenues. For example, the Annual Report reveals significant improvements in
Heilig-Meyers' current ratio (current assets to current liability) and its total debt as a percentage of debt and equity,

for Heilig-Meyers. (Goodman Dep. at 212.) For the quarter ending May 31, 2000 then, when the May 25th Transactions occurred, the cumulative consolidated operating earnings for Heilig-Meyers before taxes and interest totaled more than $16.4 million.[13] While earnings for the first fiscal quarter of 2001 (ending on May 31, 2000) were below the corresponding budgeted earnings for the company, these positive operating earnings demonstrate that Heilig-Meyers continued to generate significant operating profits throughout the period in which the May 25th Transactions occurred. Heilig-Meyers' successful implementation of its divestiture strategy, and its resulting improvements in operating earnings, provide a stark contrast to the line of "deathbed" cases, such as *Miller & Rhoads*, where the debtor "was losing money in every store on an operating basis before loan interest payments." 146 B.R. at 953. In the words of Heilig-Meyers' Chief Financial Officer,

> In reviewing our progress [during fiscal 2000], I would say that Heilig-Meyers had a very productive year. During this period, we successfully divested non-core businesses, repositioned the firm, and developed a strategic plan for reinvesting in our core business to improve operating performance. Over the next 12 months we intend to refocus our financial resources on what we've been doing well for more than 85 years.

(Defs.' Dep. Ex. 47, p. 0012-000010.) The uncontroverted evidence is that by May 2000, Heilig-Meyers was profitably operating as a going concern its core business of 874 retail stores, generating more than $2 billion in revenues on an annual basis.

---

both of these tests measuring the liquidity and leverage of Heilig-Meyers, with improvements in these measures being directly linked to the results of the divestiture program. (Defs.' Dep. Ex. 47, p. 47.)

[13] Another common measure for evaluating operating performance is referred to as "EBITDA," which calculates earnings before interest, taxes, depreciation and amortization, thereby attempting to calculate the true *operating* performance of a business. Heilig-Meyers produced an EBITDA for the period of March through May 2000 of more than $26 million. (Defs.' Dep. Ex. 40, p. 9.)

3.    **At The Time Of The May 25th Transactions, Heilig-Meyers Was Actively Implementing A Series Of Strategic Initiatives To Modernize Its Core Businesses.**

In its fiscal years 2000 and 2001, Heilig-Meyers actively pursued and invested heavily in a series of initiatives designed to modernize its core businesses. These initiatives were described at length in the 2000 Annual Report, distributed to shareholders in June 2000, and may be summarized as (a) re-designing the merchandising function of Heilig-Meyers, (b) remodeling the store format, and (c) restructuring the credit process. The significance of these three initiatives is that they unequivocally demonstrate that Heilig-Meyers' business was not "moribund" or static, or even limited to implementing the divestiture strategy; rather, at the time of the May 25th Transactions, Heilig-Meyers was actively pursuing and investing in programs to modernize its business.

Mr. Goodman, the Chief Financial Officer, has explained that "re-engineering" the method by which Heilig-Meyers purchased merchandise from its vendors would yield significant cost savings for the business:

> The first investment focus is merchandising re-engineering. We're redesigning our whole supply chain structure to streamline inventory flow and the logistics involved in serving our customers. We've invested in new technology and specialized people to allow both the manufacturers we work with and Heilig-Meyers to significantly reduce overall inventory levels while speeding delivery to our customers. . . . [W]e're working closing with suppliers so they can schedule their production more efficiently. Again, this allows Heilig-Meyers to reduce its inventory commitment, which enables us to further reduce costs. As inventory comes down, handling costs, carrying costs, shrinkage, delivery, and warehousing costs all come down. So restructuring our supply chain strategy is a key target for capital investment.

(Defs.' Dep. Ex. 47, p. 10.) Mr. Donald Shaffer, then the President and Chief Operating Officer of Heilig-Meyers, confirmed the company's focus on improving its merchandising techniques and established as a corporate goal to have all of Heilig-Meyers' vendors participating in the new

forecasting program by the end of the third quarter in fiscal 2001 (*i.e.*, November 2000). (*Id.* at

pp. 7 – 8.)

The second major initiative pursued by Heilig-Meyers during fiscal 2001 was improving

the format of its retail stores. As Mr. Shaffer explained in the 2000 Annual Report,

> [W]e have developed a new store format that brings together new product and
> visual presentation supported by an enhanced advertising program. . . . [W]e are
> using the 14 stores in Las Vegas and St. Louis markets to experiment with
> different merchandise, visual presentation and advertising alternatives. In Las
> Vegas we eliminated all non-furniture product with the exception of home
> entertainment while we maintained the full merchandise mix in the St. Louis
> stores . . . . Within the next three years, we expect to complete the renovations of
> the majority of our stores.

(*Id.*)

The third strategic initiative sought to modernize the credit programs offered by Heilig-

Meyers to its customers. As explained by Mr. Goodman in the 2000 Annual Report,

> [W]e intend to convert from an installment plan [run through the individual
> stores] to a centralized revolving credit program. . . . [This conversion] will have
> a strong positive impact on our financial picture. The program we are putting in
> place will allow us to finance our credit portfolio much more efficiently. Moving
> to a platform that is more standardized and centralized will enable us to finance
> our credit program independent of our retail operations and improve our overall
> cost of capital. We also expect these initiatives to result in a more predictable
> customer payment pattern, which should facilitate our fiscal planning.

(*Id.* at 10.) The first phase of this program – generating centralized billing statements, late

notices and collection letters – was being introduced to the entire chain of Heilig-Meyers stores

in June 2000, contemporaneous with the May 25th Transactions. (*Id.* at 15.) The centralization

of credit extension and collections was then in process of being phased in over a 24-month

timeframe. *Id.*

Heilig-Meyers' pursuit of these three strategic initiatives emphasizes that the company

and its management were actively seeking to improve and modernize the business model. The

company was not "dead on its feet." Nor were these strategic initiatives merely hypothetical plans and wish-lists. To the contrary, Heilig-Meyers allocated *$14.6 million of its capital budget* specifically to these three initiatives during fiscal 2001 to speed their implementation (Goodman Dep., p. 184), this amount in addition to *another $25 million* of capital expenditures for maintenance of the stores and the related infrastructure. (Def. Dep. Ex. 46, p. 0003229.) And by June 20, 2000, after the transfers at issue in this litigation, when Heilig-Meyers announced in a press release its results for the first fiscal quarter of 2001, its President and Chief Operating Officer identified significant progress on each of the three strategic initiatives:

> [D]uring the quarter, the Company accomplished several objectives relating to the implementation of the strategic initiatives associated with the core store turnaround plan. Among those were the grand opening of four Las Vegas and ten St. Louis Heilig-Meyers test stores. "We reopened the Las Vegas stores in mid-March and, to date, sales have increased over thirty-five percent. Customers have reacted very favorably to the changes we made with respect to the in-store layout and appearance, as well as the new merchandise and financing options. . . . We've also completed the first phase of our merchandise re-engineering program . . . ." Mr. Shaffer noted that the Company was also on schedule with the overhaul of the customer credit program. "We expect to complete the rollout of our centralized billing process by the end of June [2000]. At the same time, we have started to implement the centralization of the credit approval and collections process in the 223 stores scheduled for completion by year end. . . . Based on the tests we've conducted, it is the Company's belief that these are the integral changes necessary to broaden our customer base, lower the cost of operations and improve the earnings performance of the Heilig-Meyers stores."

(Defs.' Dep. Ex. 44.) Based on the undisputed statements and admissions of the most senior officers of Heilig-Meyers, at the time the May 25th Transactions closed and thereafter, Heilig-Meyers was making significant strides toward accomplishing its strategic initiatives to modernize its core businesses. Again, the notion of a company's actively investing significant capital to modernize its operations and improve its profitability runs completely counter to any conceivable characterization of being "on its deathbed," "nominally existent," or on the verge of "shutting its doors."

### 4.   By The Time The May 25th Transactions Closed, Heilig-Meyers Had Resolved Its Immediate Liquidity Concerns.

Unlike other debtors who have been found to be on their "deathbeds," Heilig-Meyers did not suffer from a severe cash or liquidity crisis at or near the closing of the May 25th Transactions or, indeed, at the time the Chapter 11 cases were commenced.  During the several months preceding the May 25th Transactions, Heilig-Meyers had indeed identified a number of short-term liquidity concerns, but all of them had been successfully resolved by the time of the Ninth Amendment or shortly thereafter.

From January 2000 through the closing of the May 25th Transactions, the board of directors of Heilig-Meyers was focused on certain liquidity issues facing the company, including principally (i) the scheduled maturity of the Bank Group Credit Agreement in July 2000; (ii) the need for adequate availability under the company's working capital revolving credit facility with the Bank Group; (iii) the possibility that, *if* the long-term unsecured debt rating of Heilig-Meyers fell below specified levels, then Heilig-Meyers would be contractually required under its receivable securitization facilities to fund a "spread account" in the amount of up to $40 million; (iv) the scheduled maturity of one of Heilig-Meyers' asset securitization facilities in July 2000. (Def. Dep. Ex. 31, 24, 37.)  However, the undisputed evidence provided through a series of depositions of Heilig-Meyers' senior officers demonstrates that, through changes made in late May to the Ninth Amendment and other accomplishments, all of the short-term liquidity problems anticipated by Heilig-Meyers at or near the time of the May 25th Transactions had been resolved, and the nearest maturity event faced by the company on any of its credit facilities was not until January 2001 – *more than 7 months after* the May 25th Transactions closed. (Wilson Dep. at 155.)

Through the Ninth Amendment, Heilig-Meyers accomplished two significant achievements relating to its short-term maturities and working capital availability. First, under the terms of the Ninth Amendment, the Bank Group's working capital facility was extended for one year, from May 2000 until May 2001. (Defs.' Dep. Ex. 49, p. 16.) The Bank Group's facility provided revolving credit financing for up to $140 million and, as of May 31, 2000, no funded balances were outstanding on this facility. (*Id.*) Despite the substantial availability existing under this credit facility as of May 31, 2000, Heilig-Meyers' projections for the third fiscal quarter 2001 (*i.e.*, the three-month period ending *November* 2000) showed projected availability of only $4 million. To address this second concern, at Heilig-Meyers' request, the Ninth Amendment further revised the Bank Group Credit Agreement to provide that up to an additional $20 million of the revolver be available to Heilig-Meyers for working capital needs, rather than reserved simply to fund the "spread account". (Defs.' Dep. Ex. 27, 28.) In addition, the Bank Group agreed to release to Heilig-Meyers up to $20 million of proceeds of non-operating asset sales to fund the "spread account," if the downgrade occurred.[14] *Id.* Heilig-Meyers had identified substantial non-operating assets, with estimated values exceeding $57 million, to be liquidated to provide these funds, if the downgrade occurred; this source of liquidity does not include other available sources also identified by the company, such as eliminating the cash dividend, closing unprofitable stores, and obtaining new financing. (Defs.' Dep. Ex. 37.) As a result of these changes in the mechanics of the working capital facility, Heilig-Meyers' concerns about liquidity in the third quarter of fiscal 2001 had been resolved.[15]

---

[14] The downgrade in Heilig-Meyers' long-term unsecured debt rating did not occur until August 2000, after the company announced its unilateral deferral of interest payments due under its public bond indenture on or about August 1, 2000. (Wilson Dep. at 87 - 88.)

[15] As Ms. Wilson testified:

> Q    And at that point [May 2000] the liquidity concerns that were raised in the May 17th board meeting were resolved at least for that time being, correct?
> A    Related to the working capital availability, yes.

By mid-June 2000, after the closing of the May 25th Transactions, Heilig-Meyers was forecasting a cushion of $17.5 million in its third quarter liquidity. (Defs.' Dep. Ex. 56, p. 3.)

In July 2000, Heilig-Meyers also successfully obtained the agreement of its conduit securitization lenders to extend the July 2000 maturity date for an additional 12-month period.[16] (Defs.' Dep. Ex. 64; Wilson Dep. at 237.) Through this extension, and the extension of the maturity dates of the Bank Group Credit Agreement and the FUNB Synthetic Lease, the next maturity or amortization date facing Heilig-Meyers had been deferred until January 2001. (Defs.' Dep. Ex. 49, p. 16.) As Ms. Wilson testified:

> Q:    So would it be fair to say, of the maturities you were most immediately concerned with . . . in May [2000], all of the next ones that were really going to come up weren't going to come up until January of 2001?
>
> A:    Yes, but those were the ones that I was most immediately concerned about. They weren't short-term in nature, but yes.
>
> Q:    But the company was able to come up with a solution to deal with the maturities that were going to occur in the year 2000, wasn't it?
>
> A:    Yes.

(Wilson Dep. at 155.)

By successfully addressing its working capital availability and deferring short-term maturities on various credit facilities, Heilig-Meyers was able to solve the liquidity concerns that had been apparent prior to the May 25th Transactions. Indeed, as Mr. Goodman testified, the Ninth Amendment "was an important improvement in our liquidity position". (Goodman Dep. at 128.) Far from being mired in an irretractable liquidity crisis, by the time of the May 25th Transactions, and in part through the terms of the Ninth Amendment itself, Heilig-Meyers had

---

(Wilson Dep. at 77.)

proactively addressed its immediate liquidity needs. As it went forward from the May 25th

Transactions, Heilig-Meyers had no outstandings on its $140 million working capital revolver

(Defs.' Dep. Ex. 49, p. 16), had deferred all upcoming maturities and amortization events

through January 2001, and was projecting substantial liquidity cushions for the upcoming fiscal

quarters. (Defs.' Dep. Ex. 56.)

> **5.**    **A Number Of Other Factors Further Demonstrate That Heilig-Meyers Was Not On Its Financial Deathbed Or Facing Imminent Liquidation At The Time Of The May 25[th] Transactions.**

Numerous other considerations also weigh heavily against any suggestion that Heilig-

Meyers was on its "financial deathbed" at the time of the May 25th Transactions. These

considerations include the following:

(a)    At the time of the May 25th Transactions, Heilig-Meyers' stock was publicly traded on the New York Stock Exchange and had a market capitalization of over $100 million. (Goodman Dep. at 225.) None of the decisions finding that a debtor was on its financial deathbed during the preference period has involved a publicly traded company having such a substantial market capitalization.

(b)    At the time of the May 25th Transactions, Heilig-Meyers enjoyed a long-term unsecured debt rating of BB- by Standard and Poor's and Ba3 by Moody's Investors Service, Inc. (Defs.' Dep. Ex. 49, p. 17.)

(c)    At the time of the May 25th Transactions, Heilig-Meyers was not experiencing difficulty adequately supplying its retail stores with merchandise from vendors. (Shaffer Dep. at 105.)

(d)    At the time of the May 25th Transactions, Heilig-Meyers was not in default – payment or otherwise -- under any of its bank credit facilities (Defs.' Dep. Ex. 49) or with any other creditors. (Defs.' Dep. Ex. 64.)

(e)    On May 13, 2000, Heilig-Meyers paid a cash dividend of $0.02 per share to its stockholders in continuation of its traditional dividend policy. (Defs.' Dep. Ex. 49, p. 6; Goodman Dep. at 174.)

---

[16] This extension related to the commitment termination date for Heilig-Meyers' 1997-1 certificates issued in connection with the company's securitized receivables, and the extension was made from July 18, 2000 through July 17, 2001. (Defs.' Dep. Ex. 49, p. 16.)

(f) At the time of the May 25th Transactions, Heilig-Meyers was not experiencing any significant operational problems sufficient to drive it toward bankruptcy. (Shaffer Dep. at 198.)

(g) At the time of the May 25th Transactions, Heilig-Meyers had no plans to liquidate any significant number of its core retail stores. (Goodman Dep. at 188, 227.)

(h) At the time of the May 25th Transactions, Heilig-Meyers had no apparent need to pursue bankruptcy. As Mr. Goodman (then the Chief Financial Officer of Heilig-Meyers) testified:

> Q: [A]s a consequence of the renegotiation [of Heilig-Meyers' credit facilities] in May of 2000, did you have any reason to believe that a bankruptcy alternative was an appropriate alternative in May of 2000?
>
> A: No.
>
> Q: Why not?
>
> A: The company had positive cash flow, has [sic] positive earnings, had significant stockholders equity, significant tangible stockholders equity, the challenge that the company faced was maturing debt obligations which at that time I believed could be successfully renegotiated.

(Goodman Dep. at 114.) And maturing obligations were in fact being successfully negotiated. The maturity of the Bank Group credit facility had been extended for an additional year through at least May 2001 and the earliest termination date on its securitization facilities had been extended until July 2001. (Defs.' Dep. Ex. 49, p. 16.)

Finally, the clear and unrebutted testimony of the Debtors' own top management reflects a clear basis to rebut the presumption. When each was asked whether the Company was "hopelessly insolvent," on its "deathbed" or otherwise facing imminent demise in May 2000, they all denied this. (Goodman Dep. at 129-30 (CFO had no concerns or belief that the Debtors were insolvent); Wilson Dep. at 73, 106, 111 (Treasurer never heard the word "insolvent" until after bankruptcy filed); DeRusha Dep. at 93-94, 143 (CEO confident that May 2000 dividend

would not make the Debtors insolvent); Shaffer Dep. at 116 (President and COO believed company was solvent based on equity on balance sheet); Crump Dep. at 80 (Controller never expressed any concerns about insolvency in May 2000 or earlier).)

E.    SUMMARY.

On this undisputed record, the Pre-Petition Secured Lenders are entitled to partial summary judgment that the Debtors were operating their businesses as going concerns when the May 25th Transactions closed and that there is no basis to apply the "deathbed" liquidation standard, or any liquidation valuation approach, in determining the solvency or insolvency of the Debtors:

- The Debtors' audited financial statements, for the fiscal year ended immediately before the preference period, showcase positive shareholders' equity in excess of $534 million and contain no qualification by the independent public auditors that cast doubt on the Debtors' ability to continue to operate as a going concern for at least the next twelve months;

- the Debtors had successfully implemented not only a massive divestiture strategy but also a series of initiatives to modernize their core businesses, and these combined strategies had already produced an improved balance sheet and improved operating earnings;

- the Debtors had solved, at least for the medium term, their liquidity challenges and deferred near-term maturities on their credit facilities;

- Heilig-Meyers had significant market capitalization, the continuity of vendor supplies, and the absence of defaults under their credit facilities.

All of these and other factors combine to yield the inescapable conclusion that the Debtors were operating as going concerns at the time of the May 25th Transactions and by no means were on their "financial deathbed," "nominally in existence" or "dead on their feet."

Finally, the Debtors have continued to operate as debtors-in-possession for more than *three years* after the Petition Date. As the court in *DAK Industries* concluded, such an extended post-petition operating history is wholly inconsistent with any notion that the Debtors were on

death's door when they filed their bankruptcy petitions, let alone when the May 25 Transactions occurred at the outskirts of the preference period. This Court has previously taken various actions, at the Debtors' urging, which were predicated on preserving the going concern nature of the Debtors' businesses.[17] The Debtors could not possibly be heard to argue now that they were not going concerns on the Petition Date or on the prior date of the May 25th Transactions. *See generally, Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) (principles of judicial estoppel).

The Pre-Petition Secured Lenders therefore request entry of summary judgment establishing that that the solvency or insolvency analysis to be conducted in this litigation shall be based on a going concern valuation principles, and that no testimony be allowed based upon valuation techniques predicated on liquidation values.

II.     **THE PRE-PETITION SECURED LENDERS HAVE PRODUCED SUFFICIENT EVIDENCE OF HEILIG-MEYERS' SOLVENCY AS OF THE DATE OF THE MAY 25TH TRANSACTIONS TO REBUT THE INITIAL PRESUMPTION OF INSOLVENCY CREATED PURSUANT TO SECTION 547(f).**

The Pre-Petition Secured Lenders do not dispute that they face an initial presumption of insolvency applicable to each of the Debtors during the 90 days immediately preceding the Petition Date. Section 547(f) of the Bankruptcy Code specifically provides that, for purposes of §547, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date . . . of the petition." 11 U.S.C. §547(f). The effect of this presumption is

---

[17] *See, e.g., Final Order Authorizing Debtors-In-Possession to Borrow Funds with Priority over Administrative Expenses and Secured by Super-Priority Liens on Property of the Estates*, entered July 26, 2001, where the Court stated as a finding of fact that "Entry of this Order will minimize disruption of the Debtors as 'going concerns' . . . ." Recital ¶S.

defined by Federal Rule of Evidence 301[18], made applicable by Federal Rule of Bankruptcy

Procedure 9017. In this context, Federal Rule of Evidence 301 requires the creditor against

whom the presumption is raised to come forward with some evidence of the debtor's solvency to

meet or rebut the presumption. If the creditor introduces evidence of the debtor's solvency, then

the trustee or debtor-in-possession must come forward with an affirmative showing of insolvency

and carry its burden of proof of insolvency. *See In re Roblin Indus., Inc.*, 78 F.3d 30 (2nd Cir.

1996); *In re Koubourlis*, 869 F.2d 1319 (9th Cir. 1989); *In re Alper-Richman Furs, Ltd.*, 147 B.R.

140 (Bankr. N.D. Ill. 1992); *In re Almarc Mfg., Inc.*, 60 B. R. 584 (Bankr. N.D. Ill. 1986). *See

also, Collier on Bankruptcy*, ¶547.12, 15th Ed. Rev.[19]

Not every tender of "evidence" of solvency will be deemed sufficient to rebut the

presumption of §547(f). *See, e.g., In re World Fin. Servs. Ctr., Inc.*, 78 B.R. 239, 241 (Bankr. 9th

Cir. 1987), *aff'd mem.*, 860 F.2d 1089 (9th Cir. 1988) (declaration by defendant's credit manager

that, in his opinion, debtor was solvent does not rebut the presumption); *In re Miniscribe Corp.*,

123 B.R. 86 (Bankr. D. Colo. 1991) (same); *In re Blue Point Carpet, Inc.*, 102 B.R. 311 (Bankr.

E.D.N.Y. 1989) (presumption not overcome by evidence of substantial gross sales at a loss

approximately six months before preference period); *In re International Diamond Exchange

Jewelers, Inc.*, 177 B.R. 265 (Bankr. S.D. Ohio 1995) (where creditor merely challenged

debtor's accounting methods but did not provide any evidence demonstrating debtor's solvency,

---

[18] Federal Rule of Evidence provides: "In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

[19] Colliers explains the §547(f) presumption as follows: "This presumption of insolvency is rebuttable, and the creditor has the initial obligation to present 'some evidence' that the debtor was solvent at the time the transfer was made. If the creditor's evidence sufficiently rebuts the presumption, the evidentiary burden shifts back to the trustee to affirmatively demonstrate the debtor's insolvency. The trustee bears the ultimate burden of proving, by a preponderance of the evidence, that the debtor was insolvent at the time of the transfer." *Id.*

the presumption is not rebutted); *In re Candor Diamond Corp.*, 68 B.R. 588 (Bankr. S.D.N.Y. 1986) (accountant's "review" of debtor's unaudited financial statements which predated petition date by up to 9 months was insufficient to rebut presumption under circumstances of the case).

The case law applying the presumption has established some general guidelines as to what constitutes sufficient evidence to rebut the presumption. For example, "[a] financial statement showing positive net worth is sufficient to rebut the presumption of insolvency." *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996), cited approvingly in *Colliers on Bankruptcy, supra* at ¶547.12; *In re Alamarc Mfg., Inc.*, 60 B.R. 584 (Bankr. N.D. Ill. 1986)(unaudited financial statement prepared within 60 days of subject transfer showing significant positive net worth sufficient to rebut presumption). The cases also reflect that the presumption is sufficiently rebutted if the debtor's sworn bankruptcy schedules indicate that assets exceeded liabilities at the petition date and there is no evidence or suggestion that the schedules were inaccurate. *See Roblin Indus.*, 78 F.3d at 34; *Koubourlis*, 869 F.2d at 1322; *In re Johnson*, 189 B.R. 744, 747 (Bankr. N.D. Iowa 1995) ("Debtor's schedules filed in his chapter 11 case are sufficient to support a finding of solvency at the time of the transfers.")[20]; *In re Pembroke Dev. Corp.*, 122 B.R. 610, 612 (Bankr. S.D.Fla. 1991)("information provided by a debtor on the schedules to the bankruptcy petition is sufficient to rebut the presumption of insolvency" even though the debtor challenged its own schedules as not reflecting "current market conditions"). *See also* COLLIERS ON BANKRUPTCY, *supra*, stating "[t]he presumption [of

---

[20] The court authoring this decision also provides a summary of two different approaches for evaluating the necessary threshold of evidence to rebut the presumption. It describes some courts as requiring "substantial evidence" to rebut the presumption and others as requiring "some evidence" of solvency to rebut the presumption, finding that the "latter formulation comports with the legislative history of 11 U.S.C. §547(f)." 189 B.R. at 746. The court concludes that "the evidence necessary to rebut the presumption is that which would reasonably support a finding to the contrary," and proceeds to find the debtor's schedules as yielding sufficient evidence to rebut the presumption, thereby requiring the trustee to introduce evidence to carry its burden of proof. *Id.* at 746-47.

§547(f)] may also sufficiently be rebutted if the debtor's schedules submitted in support of its bankruptcy petition indicate that assets exceed liabilities."

The Pre-Petition Secured Lenders seek entry of partial summary judgment, based on the undisputed record in this adversary proceeding, that they have produced sufficient evidence of the Debtors' solvency at the time of the May 25th Transactions and the Petition Date to rebut the initial presumption of insolvency, thereby requiring the Debtors to make an affirmative showing of their insolvency and to carry their burden of proof in the insolvency determination.

The evidence of the Debtors' solvency as of the time of the May 25th Transactions is substantial and may be summarized as follows:

1.     Fiscal 2000 Audited Financial Statements and Related Filings.

After the closing of the May 25th Transactions, the Debtors filed their Form 10-K, the annual report required pursuant to the Securities Exchange Act of 1934, for the fiscal year ended February 29, 2000. This report contained audited financial statements for the Debtors, prepared on a consolidated basis, as of February 29, 2000, reporting shareholders' equity in excess of $534 million. (Defs.' Dep. Ex. 45.) These financial statements contain significant analysis demonstrating that certain categories of assets (such as cash, accounts receivable, and the Debtors' retained interest in securitized receivables) are carried on the financial statement at their "fair value".[21] In their statement filed with the Form 10-K, the Debtors' independent public

---

[21] For example, the Form 10-K reports that the carrying amount of cash, accounts receivable and other receivables "approximates fair value because of the short-term maturity of these assets. Other receivables consist primarily of cash balances maintained in collateral accounts associated with the Company's accounts receivable securitization program." (*Id.* p. 44.) Extensive analysis is presented showing allowances and write-offs made for doubtful accounts receivable, reducing the carrying amount of accounts receivable accordingly. (*Id.* p. 55.) The 10-Q recites that the carrying amount of the Debtors' retained interest in securitized receivables "approximates fair value, based upon customer payment experience and discounted at the market rate." (*Id.* p. 44.) The 10-Q further states that the carrying value of the Debtors' inventory on the financial statements is at the *lower* of cost or market value. All of these statements and analyses are among the presentation of the Debtors' financial condition audited and confirmed by Deloitte & Touche as of February 29, 2000. Even with the benefit of hindsight, Mr. Goodman, the Chief Financial Officer of the Debtors at the time, testified that the Debtors' analysis, in its fiscal 2000 10-Q, of the fair

auditors opined, based on their extensive audit of the Debtors' businesses and financial condition, that the accompanying balance sheets and other financial statements "fairly" present the financial position of the Debtors "in all material respects." (*Id.* at 50.) While certain of the Debtors' assets, such as property, plant and equipment or goodwill, are reflected at historical cost amounts net of accumulated depreciation or amortization, even if significant additional discounts were applied to these amounts in an attempt to reach a "fair valuation" of assets, the Debtors would continue to show substantial positive shareholder equity.[22]

The Debtors' Form 10-K for fiscal year 2000, reporting positive shareholders' equity in excess of $534 million, "fairly" presents the Debtors' financial condition as of February 29, 2000, less than 90 days before the closing of the May 25th Transactions. This 90-day gap is closed by the Debtors' Form 10-Q, filed with the Securities and Exchange Commission, for the period ended May 31, 2000, and by the accompanying pronouncements made by the Debtors concerning their financial condition.[23] In their May 30, 2000 10-Q filing, the Debtors continued to report shareholders' equity in excess of one-half billion dollars ($514 million), the primary changes from the prior 10-K filing being attributable to required changes in accounting treatment. (Defs.' Dep. Ex. 48, pp. 3-6.) Moreover, the Debtors provided a letter, executed by the chief executive officer, the chief financial officer, and the corporate controller, representing to Deloitte & Touche that no material events had occurred since February 29, 2000 which would materially affect the financial condition of the Debtors, other than the completed divestiture of

---

value of various assets, such as cash, net accounts receivable, retained interest in securitized receivables and the like, was accurate. (Goodman Dep. at 243.)

[22] For example, the property, land and equipment is reported at approximately $290 million net of accumulated depreciation, and goodwill (excess costs over net asses acquired, net) is reported at approximately $143 million. (*Id.* at p. 27.)

[23] Although the 10-Q has an effective reporting date of May 31, 2000, it is noteworthy that it was actually filed on July 17, 2000. If the Debtors believed the information was materially misleading or inaccurate at the time of filing, they were required by federal securities laws to correct any such inaccuracies.

the Berrios assets and the extension of the maturity of the Bank Group's credit agreement. (Def.

Dep. Ex. 48.) Indeed, as previously discussed, the Debtors' financial operating performance

during the first quarter of fiscal 2001 (March through May, 2000) was substantially positive,

with net operating earnings before interest and taxes for the period exceeding $16.4 million.

This operating performance from March through May 2000, the Debtors' own statements that no

material adverse effects had occurred during the period of March through May 2000, and the

content of the Form 10-Q filed for the period ending May 31, 2000, demonstrate that the

financial condition of the Debtors as reported in the audited financial statements had not

deteriorated to any material extent by the time of the May 25th Transactions. Accordingly, the

Debtors' audited financial statements for the fiscal year ending February 29, 2000 continue to

provide substantial evidence of the Debtors' solvency as of the May 25th Transactions, and are

sufficient as a matter of law to rebut the presumption of §547(f). *See Jones Truck Lines*, 83 F.3d

at 258; *Alamarc Mfg.*, 60 B.R. at 586; COLLIERS ON BANKRUPTCY at ¶547.12.

    2.    The Debtors' Bankruptcy Schedules.

    The Debtors' bankruptcy schedules were prepared and executed under oath by Paige

Wilson as the then chief financial officer for the Debtors (Defs.' Dep. Ex. 70) and filed with the

Court on October 30, 2000. The summary of the bankruptcy schedules report total assets

exceeding $1.3 billion and liabilities of approximately $885 million, yielding a positive

shareholders' equity as of the Petition Date of more than $423 million. *Id.* Ms. Wilson has

testified that these schedules accurately reflect the assets and liabilities of the Debtors at the

Petition Date.[24] The Debtors have never amended or withdrawn these schedules. While the

---

[24] In Ms. Wilson's deposition (p. 267), she testified as follows:
    Q:    And I assume when you signed [the bankruptcy schedules] under penalty of perjury that you
            believed it to be true at the time that you signed it?

basis for valuing the assets included in the Debtors' schedules is a composite of book or "carrying" values, cash balances, and estimated market values (*Id.* pp. 1- 4) and none of these values was apparently market tested, the overwhelmingly positive shareholders' equity as of the Petition Date, supported by the Debtors' admission that these schedules were accurately prepared, is sufficient as a matter of law to rebut the initial presumption of §547(f), therefore requiring the Debtors to put forward evidence and carry their burden of proof on the issue of the Debtors' solvency as of the May 25th Transactions.[25]  *See Roblin Indus.*, 78 F.3d at 34; *Koubourlis*, 869 F.2d at 1322; *Johnson*, 189 B.R. at 746; and *Pembroke*, 122 B.R. at 612.

### 3. Debtors' Admissions as to Solvency

One of the more unusual aspects of this litigation is that *every* principal officer of the Debtors has acknowledged that the Debtors *were solvent* at the time of the May 25th Transactions. These admissions are not limited to statements made by these officers at the time of the May 25th Transactions, but also extend to recent deposition testimony of the Chief Executive Officer, the Chief Financial Officer, the President and Chief Operating Officer, and the Treasurer made with the benefit of hindsight. Several decisions have held that statements by a debtor confirming or representing solvency may be sufficient to rebut the presumption of §547(f). *See, e.g., In re Thomas Farm Sys., Inc.*, 18 B.R. 541, 542 (Bankr. E.D.Pa. 1982); *In re Brooks*, 44 B.R. 963 (S.D. Ohio 1984).

---

A:    Yes.
Q:    And to accurately reflect the information set forth in it?
A:    All 839 sheets, yes.

[25] The Pre-Petition Secured Creditors readily acknowledge that they cannot rely in the ultimate solvency analysis merely on the Debtors' bankruptcy schedules, or even the Debtors' financial statements accompanying their Form 10-K and 10-Q filings, to contest any evidence that the Debtors come forward and produce, if any, to demonstrate their insolvency as of the May 25th Transactions. *See Miller & Rhoads*, 146 B.R. at 955; *In re Strickland*, 230 B.R. 276, 282 (Bankr. E.D. Va. 1999).

The Ninth Amendment to the Credit Agreement adopted the various representations and warranties of the Credit Agreement. Through their execution of the Ninth Amendment, the Debtors renewed their representations to the Bank Group as originally made in the Credit Agreement, including the representation that the Debtors were not "insolvent" as specifically defined in §101 of the Bankruptcy Code or under various state statutes. (Defs.' Dep. Ex. 28 and 51, §6.16.) In her deposition testimony, Ms. Wilson, the Debtors' Treasurer at the time of the May 25th Transactions, explained her understanding of these representations:

> Q:    Tell me, if you would, in your own words, what the Company was representing and warranting when they made that rep [sic] in [section 6.16]?
>
> A:    That we weren't insolvent under these various statutes, which I probably would have relied on counsel because our financial statements didn't indicate anything that wasn't [sic] a concern.
>
> Q:    And as far as you know, when the ninth amendment was signed on May 25th, the company was not insolvent, correct?
>
> A:    As far as I know.

(Wilson Dep. at 110-111.)

Mr. Goodman, the Chief Financial Officer of the Debtors at the time of the May 25th Transactions, corroborated Ms. Wilson's testimony:

> Q:    Was there any discussion about whether or not the company was insolvent on May 25th of 2000?
>
> A:    Not that I recall in my presence.
>
> Q:    Do you remember anybody expressing any concerns about [the company] being insolvent as opposed to having a liquidity problem?
>
> A:    No.
>
> Q:    As you sit here today, do you believe that the company was insolvent on May 25th, 2000?

A:      I don't.

(Goodman Dep. at 129 –130.)

Mr. DeRusha, the Chairman of the Board of Directors and the Chief Executive Officer of

the Debtors at the time of the May 25th Transactions has also testified that the Debtors remained

solvent after the May 25th Transactions:

Q:      [As of June 12, 2000], was the company solvent?

A:      Define solvent.

Q:      Well, the company's assets worth more than its liabilities.

A:      In a business sense, the company's assets were worth more than its
        liabilities.  If you took the balance sheet and the inventory was X as
        reported, the assets were greater than the liabilities.

Q:      Was there some sense in which the company was not solvent?

A:      No, but there's some other definitions of solvent and insolvent that don't
        necessarily apply to an ongoing business. . . .

(DeRusha Dep. at 142-143.)   Mr. Shaffer, the President and Chief Operating Officer of the

Debtors at the time of the May 25th Transactions similarly testified that he believed the company

was solvent based on his understanding of the Form 10-K that was filed after the May 25th

Transactions showing over a half billion dollars of shareholder equity.  (Shaffer Dep. at 116.)

These statements may not take the place of painstaking valuation testimony and analysis.

However, these statements collectively present uniform admissions by the Debtors' senior

officers that the Debtors were solvent at the time of the May 25th Transactions.   These

admissions, coupled with the audited financial statements issued contemporaneously with the

May 25th Transactions showing more than a half billion of shareholders' equity, and the Debtors'

own bankruptcy schedules showing $423 million in positive shareholder equity as of the Petition

Date, provide sufficient evidence as a matter of law to rebut the presumption arising under

§547(f).  As a consequence, the Pre-Petition Secured Lenders are entitled to partial summary judgment determining that the initial presumption of §547(f) has been rebutted, requiring the Debtors to come forward with evidence, if any, of the Debtors' insolvency as of the May 25th Transactions.

## CONCLUSION

The Pre-Petition Secured Lenders have filed this Motion for the purpose of streamlining the issues at trial relating to the determination of whether the Debtors were solvent or insolvent as of the May 25th Transactions.  The first issue addressed in this Motion is the appropriate standard for this Court to apply in the balance sheet test for solvency – a going concern valuation or a liquidation valuation.  Because there can be no serious dispute that the Debtors were operating profitably as a going concern at the time of the May 25th Transactions and were not in any sense on their financial "deathbed," the Pre-Petition Secured Lenders are entitled to partial summary judgment determining that any solvency analysis to be conducted here must be based on going concern valuation principles.  Such a determination should eliminate from the trial any evidence of (i) the liquidation values of assets, (ii) the inclusion of liabilities that arose only upon the Debtors' filing for bankruptcy; (iii) decisions to liquidate massive numbers of stores on a "going out of business" basis, and (iv) other aspects of a traditional liquidation analysis.  The second issue involves simply which party, the Debtors or the Pre-Petition Secured Lenders, has the burden of going forward to produce evidence of the Debtors' solvency or insolvency.  Because the Pre-Petition Secured Lenders are able to point to significant undisputed evidence in the record that demonstrates the Debtors were overwhelmingly solvent as of the May 25th Transactions, the initial presumption created by §547(f) has been rebutted, requiring the Debtors

to come forward with evidence of the Debtors' insolvency. A determination on this issue will aid the litigation by clarifying the order of proof and which party has the burden of coming forward with evidence.

For the foregoing reasons and based upon the foregoing authorities, the Pre-Petition Secured Lenders respectfully move this Court to enter partial summary judgment finding that the insolvency analysis to be conducted shall be performed on a going concern basis and that the initial presumption of §547(f) has been rebutted.

Dated:   September 25, 2003
         Richmond, Virginia

        KUTAK ROCK LLP

        By:  /s/ Kevin R. Huennekens
            Kevin R. Huennekens
            Loc Pfeiffer
            Bank of America Center
            1111 East Main Street, Suite 800
            Richmond, Virginia  23219-3500
        Telephone:  804.644.1700
        Facsimile:  804.783.6192

            -and-

        Gregory J. Murphy
        Scott M. Tyler
        MOORE & VAN ALLEN, PLLC
        Suite 4700
        100 North Tryon Street
        Charlotte, North Carolina  28202-4003

        CO-COUNSEL FOR WACHOVIA AND THE BANK
        GROUP

        COOK HEYWARD LONNES LEE & HOPPER

        By:  /s/ Kevin R. Huennekens for David Hopper
            David D. Hopper
            4551 Cox Road, Suite 210
            P.O. Box 29629
            Richmond, Virginia 23242
        Telephone:  804.747.4500
        Facsimile:  804.762.9608

-and-

Lori R. Fife
Bruce S. Meyer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

CO-COUNSEL FOR PRUDENTIAL

## CERTIFICATE OF SERVICE

Pursuant to the Local Rules of this Court, I certify under penalty of perjury that a copy of this document was served on September 25, 2003 by email as authorized in the Case Management Order entered February 6, 2003 on the following persons:

Bruce H. Matson, Esquire at bmatson@leclairryan.com
LECLAIR RYAN, P.C.
707 East Main Street
11th Floor
Richmond, Virginia  23219

Lynn L. Tavenner, Esquire at ltavenner@tb-lawfirm.com
Tavenner & Beran, PLC
1015 East Main Street
First Floor
Richmond, VA  23219

Robert W. Turken, Esquire at rturken@bilzin.com
Mitchell Widom, Esquire at mwidom@bilzin.com
Raquel Fernandez, Esquire at rfernandez@bilzin.com
BILZIN SUMBERG BAENA PRICE & AXELROD LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL  33131

David D. Hopper, Esquire at ddhopper@chllh.com
Cook, Heyward, Lonnes, Lee & Hopper, P.C.
4551 Cox Road, Suite 210
P.O. Box 29629
Richmond, Virginia  23242

/s/ Kevin R. Huennekens
Counsel